IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Case No. 1:22-CV-568

| | |
|---|---|
| JULIETTE GRIMMETT, RALSTON LAPP GUINN MEDIA GROUP, and the JOSH STEIN FOR ATTORNEY GENERAL CAMPAIGN, <br><br> Plaintiffs, <br><br> v. <br><br> DAMON CIRCOSTA, in his official capacity as Chair of the North Carolina State Board of Elections, STELLA ANDERSON, in her official capacity as Secretary of the North Carolina State Board of Elections, JEFF CARMON III, in his official capacity as Member of the North Carolina State Board of Elections STACY EGGERS IV, in his official capacity as Member of the North Carolina State Board of Elections, TOMMY TUCKER, in his official capacity as Member of the North Carolina State Board of Elections, and N. LORRIN FREEMAN in her official capacity as District Attorney for the 10th Prosecutorial District of the State of North Carolina, <br><br> Defendants. | **MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION** |

## INTRODUCTION

Plaintiffs Juliette Grimmett, Ralston Lapp Guinn Media Group ("Ralston Lapp"), and the Josh Stein for Attorney General Campaign ("Stein Campaign," all three collectively referred to as "Plaintiffs"), by their undersigned counsel, respectfully submit this Memorandum of Law in Support of their Motion for Temporary Restraining

Order/Preliminary Injunction. Specifically, Plaintiffs seek to enjoin Defendants from enforcing N.C. Gen. Stat. § 163-274(a)(9) on the ground that the statute violates the First Amendment to the U.S. Constitution by regulating core protected political speech in a manner not tailored to achieve a compelling state interest.

## STATEMENT OF FACTS

I. The Parties.

A. Plaintiffs.

Juliette Grimmett is a resident of North Carolina, a survivor of sexual assault and a public advocate for the rights of sexual assault victims. (Compl. ¶ 6.) Ralston Lapp is a DC-based media consulting firm that advises political campaigns on media strategies and advertising. (Declaration of Jason Ralston, sworn to July 20, 2022 ("Ralston Decl.," attached to the Motion as Exhibit 2), at ¶ 2.) The Stein Campaign is the political campaign committee of North Carolina Attorney General, Josh Stein, who was successfully elected as North Carolina's Attorney General in 2016 and again in 2020. (Declaration of Scott R. Falmlen, sworn to July 20, 2022 ("Falmlen Decl.," attached to the Motion as Exhibit 1), at ¶ 2.) Mr. Falmlen is the treasurer of the Stein Campaign. (*Id*. at ¶ 1.)

B. Defendants.

Defendants are the Chair and other members of the North Carolina State Board of Elections ("NCSBE") in their official capacities (Compl. ¶¶ 9-13), and N. Lorrin Freeman, in her official capacity as the District Attorney for the 10th Prosecutorial District of the State of North Carolina (Wake County). (*Id*. at ¶ 14.)

## II. The Unconstitutional Statute.

Section 163-274(a)(9) of the North Carolina General Statutes (the "Statute") purports to make it "unlawful":

> For any person to publish or cause to be circulated derogatory reports with reference to any candidate in any primary or election, knowing such report to be false or in reckless disregard of its truth or falsity, when such report is calculated or intended to affect the chances of such candidate for nomination or election.

The statute defines a violation of the statute as a Class 2 misdemeanor which can provide for both imprisonment up to 60 days and criminal fines for violators. *Id*. There is no reported decision concerning the Statute and no record that it has ever been enforced against any person or political campaign.

## III. The 2020 Election for North Carolina Attorney General.

In 2020, Josh Stein, the incumbent, and Jim O'Neil, Forsyth County District Attorney, were the candidates for the Office of North Carolina Attorney General. (Falmlen Decl. ¶ 2.) The underlying dispute in this action concerns the handling of a backlog of untested rape kits in North Carolina.

### A. O'Neill's Accusations Concerning Rape Kits.

After being elected Attorney General, in April 2017, Mr. Stein enlisted the help of the State's district attorneys, including Mr. O'Neill, to determine the number of untested kits in their prosecutorial districts. (Falmlen Decl. ¶ 3.) They were asked to send a letter to each law enforcement agency in their jurisdiction, tally the results, and then notify the State Crime Lab of that number. (*Id*.) Later that year, the Department of Justice commissioned a state-wide inventory concerning that backlog. (*Id*.)

3

After the study concluded, the Department of Justice issued a Report indicating that there was a statewide backlog of some 15,000 untested rape kits.[1] Attorney General Stein thereafter secured authorization from the General Assembly for and created a rape-kit tracking system and a working group to develop a protocol for testing the as-yet untested kits, as well as all rape kits going forward. (Falmlen Decl. ¶ 4.) The Attorney General also secured a total of $4 million in additional funding to accelerate the outsourcing of the old rape kits for testing. (*Id*.) Attorney General Stein and his team then drafted the Survivor Act which secured $6 million in state funding to further outsource testing and to institute requirements so that no backlog will develop in the future. (*Id*.) The General Assembly enacted the Survivor Act and the Governor signed it into law in September 2019. *See* N.C. Gen. Stat. § 15A-266.5A.

Notwithstanding that work done by Attorney General Stein on an issue that had been largely ignored by others, O'Neill, on October 7, 2019, issued a statement claiming that the Attorney General Stein "has stood on the sidelines for almost his entire term while more than 15,000 untested rape kits have sat on the shelves of the lab that Stein is responsible for, collecting dust." (Falmlen Decl. ¶ 5.) He repeated that statement on at least two reported occasions. (*Id*.) As indicated by the Report, however, the untested rape kits were not in the custody of the State Crime Lab but instead actually located at local law

---

[1] The 2017 Sexual Assault Evidence Collection Kit Law Enforcement Inventory Report of the Department of Justice is found at:
https://digital.ncdcr.gov/digital/collection/p16062coll9/id/443952.

enforcement agencies across the state (including over 1,500 – 10% of the state's entire backlog – within O'Neill's prosecutorial district). (*Id.*)

O'Neill also made a statement regarding his own putative work on the subject of rape kits. On September 20, 2019, he issued a statement condemning Attorney General Stein stating that "I have been fighting & trying to give a voice to these victims for the last 23 y[ea]rs while you gave a 23 sec[ond] press conference." (Falmlen Decl. ¶ 6.) He also declared that eliminating the backlog was his "number one priority." (*Id.*)

### B. The Corrective Advertisement – *Survivor*.

In order to answer the false accusations of its opponent and inform the electorate of what it believed to be relevant facts for the election, the Stein Campaign publicly challenged those accusations with speech of its own. The Campaign produced *Survivor*, a corrective political advertisement, in the summer of 2020. (Ralston Decl. ¶ 5.) Ralston Lapp was the producer of that advertisement. (*Id.*)

Ms. Grimmett personally appeared in the political advertisement and made the following statement, drawing a contrast between efforts made by Attorney General Stein to develop and execute on a strategy to address the untested rape kits and Mr. O'Neill's failure to engage in similar efforts within his own jurisdiction:

> As a survivor of sexual assault that means a lot to me and when I learned that Jim O'Neill left 1,500 rape kits on a shelf leaving rapists on the streets, I had to speak out.

(Ralston Decl. ¶ 7.) Prior to producing *Survivor*, Ralston Lapp and the Stein Campaign had all the statements made in the political advertisement, including those of Ms.

5

Grimmett, fact-checked by an outside firm specializing in confirming the accuracy of claims made in political advertising. (*Id*. at ¶ 8.)

*Survivor* was ultimately broadcast on various television stations throughout North Carolina during September and October 2020, including television stations within this District. (Ralston Decl. ¶ 5.) The placements for those broadcasts were made by Ralston Lapp and paid for by the Stein Campaign. (*Id*.)

        **C.     O'Neill Seeks a Criminal Investigation into *Survivor*.**

On September 29, 2020, with the campaign fully underway, an attorney for the "Friends of Jim O'Neill" campaign committee filed a Complaint with the NCSBE alleging that the Stein Campaign and Attorney General Stein were in violation of the Statute on the grounds that candidate O'Neill, "who is the elected District Attorney for Forsyth County, has never in his career left 'rape kits sitting on a shelf'" because he was "never in the chain of custody as it relates to rape kits." (Falmlen Decl. ¶ 8 & Ex. A.)

The Complaint stated that "[t]o protect the integrity of future elections, the O'Neill Committee requests the Board of Elections investigate these allegations and find probable cause to refer this Complaint to the Wake County District Attorney for further action." (Falmlen Decl., Ex. A.)

Three days later, on October 2, 2020, Ms. Grimmett received a letter from a different attorney "writing on behalf of Jim O'Neill," claiming that her statement was "demonstrably false and legally actionable defamation." (Falmlen Decl. ¶ 9 & Ex. B.) That letter further claimed that although "O'Neill, in his role as Forsyth County District Attorney, is tasked with prosecuting all criminal actions in Forsyth County" and "often provides legal advice

6

to enforcement agencies," the office "has never been the 'custodial agency' of 1,500 rape kits" and "there is no shelf at the Forsyth County District Attorney's office or anywhere else over which Mr. O'Neill has ever had control where 1500 rape kits were located." (*Id*.)

The letter to Ms. Grimmett concluded by stating, "[o]n behalf of Mr. O'Neill, we demand that you immediately cease and desist from continuing to disseminate this clearly false and defamatory advertisement, and that you take all action to denounce these statements and prevent further publication." (Falmlen Decl., Ex. B.)

In fact, two separate independent fact-checking organizations – one in broadcast media, the other in print – analyzed the advertisement and neither concluded that it was false. Indeed, one of the fact checkers stated that another district attorney, "on condition of anonymity," stated that, while local law enforcement was typically responsible for having rape kits tested, that "doesn't leave the DA in that jurisdiction entirely blameless." (Falmlen Decl. ¶ 10.)

### D. The Investigation by the North Carolina State Board of Elections.

Months after the general election in which Attorney General Stein prevailed, in March 2021, investigators for the NCSBE communicated to Ms. Grimmett that they were "seeking as much information as possible" concerning the political advertisement. (Falmlen Decl. ¶ 11) On March 15, 2021, Ms. Grimmett was interviewed by NCSBE investigators. (*Id*. at ¶ 12.) Later that same month, the Attorney General's chief of staff was interviewed by the same investigators. (*Id*.)

7

On July 14, 2021, counsel for the NCSBE reported to counsel for the Stein Campaign that they had "completed our investigation and presented our findings and recommendation" to the Wake County District Attorney's Office. (Falmlen Decl. ¶ 13.)

### E. The Investigation by the State Bureau of Investigation.

Over the course of the next six months, through the end of 2021, SBI agents conducted an exhaustive series of interviews into virtually every aspect of the political advertisement's creation, production, execution, and, most critically for this Motion, content. (Falmlen Decl. ¶ 14.) Ms. Grimmett was subjected to a second interview on August 26, 2021. (*Id.*) After her re-interview, SBI investigators conducted at least five additional interviews on the subject of the political advertisement, including a principal of Ralston Lapp (Ralston Decl. ¶ 9), the Stein Campaign manager and treasurer, the Attorney General himself, as well as a second interview with the Attorney General's chief of staff. (Falmlen Decl. ¶ 14.)

From the beginning of 2022 through late May of this year, nothing further of substance was communicated regarding the investigation. Based on further communications concerning the investigation, however, enforcement action under the Statute appears imminent. (Falmlen Decl. ¶ 15.)

## QUESTION PRESENTED

Should Defendants be enjoined from enforcement of the patently unconstitutional Statute?

# ARGUMENT

## DEFENDANTS SHOULD BE ENJOINED
## FROM ENFORCING N.C. GEN. STAT. § 163-274(a)(9)[2]

### I. THE STANDARDS FOR A PRELIMINARY RELIEF

As this Court is well aware, a "preliminary injunction is an extraordinary remedy afforded prior to trial at the discretion of the district court that grants relief *pendente lite* of the type available after the trial." *The Real Truth About Obama, Inc. v. Fed. Election Comm'n,* 575 F.3d 342, 345 (4th Cir. 2009) *vacated by* 559 U.S. 1089 (2010), *reinstated in relevant part by* 607 F.3d 355 (4th Cir. 2010); *In re Microsoft Corp. Antitrust Litig.,* 333 F.3d 517, 524-26 (4th Cir. 2003); *abrogated on other grounds by*, *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006). "The party seeking the preliminary injunction must demonstrate by "a clear showing" that, among other things, it is likely to succeed on the merits at trial." *Obama,* 575 F.3d at 345 (*citing Winter v. Nat'l Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008)). (The standards for a temporary restraining order are effectively the same. *See Chambers v. Russell*, No. 1:20CV498, 2020 WL 13042301, at *3-4 (M.D.N.C. Jun. 16, 2020)).

Accordingly, a party seeking a temporary restraining order or preliminary injunction must establish a clear showing:

---

[2] This case is ripe because "the threat of future enforcement of the false statement statute is substantial." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014). At the same time, there is no issue concerning abstention because state court criminal proceedings have not yet begun. *See United States v. South Carolina*, 720 F.3d 518, 528 (4th Cir. 2013) ("Plaintiffs need not wait to be arrested under the challenged sections of the Act before they can assert a constitutional claim" nor "live under a cloud of 'prolonged uncertainty' as to their rights.").

(1) that it is likely to succeed on the merits;

(2) that it is likely to suffer irreparable harm in the absence of preliminary relief;

(3) that the balance of equities tips in its favor; and

(4) that an injunction is in the public interest.

See *Winter,* 555 U.S. at 20 (internal citations omitted*); Obama,* 575 F.3d at 346-47 (overruling the *Blackwelder* balance-of-hardship test consistent with the holding in *Winter*).

As discussed below, Plaintiffs can make the requisite clear showing with respect to each of the four parts of the prevailing test for a preliminary injunction in the Fourth Circuit.

## II.     LIKELIHOOD OF SUCCESS ON THE MERITS

As a general matter, a party seeking to make a showing of likelihood of success on the merits "must demonstrate a reasonable probability of success." *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 339 (1999). Yet, as the Supreme Court has held, "likelihood of success" should not be equated with "success" itself given the "significant procedural differences between preliminary and permanent injunctions." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 394 (1981). In the words of that Court:

> The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary injunction hearing.

*Id*. at 395.

Plaintiffs contend that they will be able to establish that the Statute is unconstitutional. Professor Michael J. Gerhardt, a highly-respected scholar of the Constitution and First Amendment, agrees and has provided his Declaration in support of this motion. (*See* Declaration of Michael J. Gerhardt, sworn to July 19, 2022 ("Gerhardt Decl."), attached to the Motion as Exhibit 3.)

The First Amendment to the United States Constitution guarantees to all Americans the right to speak freely and state their opinions on all matters and issues, including controversial topics. Furthermore, the speech involved in this case – concerning a political candidate in the context of an election – is core political speech for which the First Amendment's protection is at its zenith. (*See* Gerhardt Decl. ¶ 7(b).)

While Plaintiffs contend that the challenged statement in *Survivor* – "O'Neill left 1,500 rape kits on a shelf" – is true, even if it were false, it is still entitled to protection and not an appropriate subject for criminal investigation or punishment under the holding of the Supreme Court in *United States v. Alvarez*, 567 U.S. 709 (2012). (*See* Gerhardt Decl. ¶ 7(f).) In *Alvarez*, the Supreme Court considered the constitutionality of the so-called Stolen Valor Act, 18 U.S.C. § 704(b), which made it a crime to falsely claim receipt of military decorations or medals and provided an enhanced penalty if the Congressional Medal of Honor was involved. (*Id.*)

Alvarez was indicted after falsely claiming that he was awarded the medal of honor. 567 U.S. at 713-14. The statement, in the words of the Court "was an intended, undoubted

11

Case 1:22-cv-00568-CCE-JLW Document 6 Filed 07/21/22 Page 11 of 17

lie." *Id*. In ultimately holding the law unconstitutional, the Court rejected a categorical rule advanced by the government that "false statements receive no First Amendment protection." *Id*. at 719.

The Court, in invalidating the statute, held that "[w]hen content-based speech regulation is in question, however, exacting scrutiny is required" because "[s]tatutes suppressing or restricting speech must be judged by the sometimes inconvenient principles of the First Amendment." 567 U.S. at 715.

For its starting place, the Court stated that "as a general matter," the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." 567 U.S. at 716. As a result, "the Constitution demands that content-based restrictions on speech be *presumed invalid* and that the Government bear the burden of showing their constitutionality." *Id*. at 716-17 (emphasis added, internal quotation omitted). The Court held that there was "no general exception to the First Amendment for false statements," *id*. at 718, because "some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee." *Id*.

The Court ultimately held that the law in question was unconstitutional because the government had "not shown, and cannot show, why counterspeech would not suffice to achieve its interest," 567 U.S. at 726, or that in seeking "to regulate the protected speech," the challenged restriction was the "least restrictive means among available, effective alternatives." *Id*. at 729.

12

After *Alvarez*, courts are required to consider First Amendment challenges recognizing that even false speech is entitled to constitutional protection, particularly in the context of political speech. Thus, in *Susan B. Anthony List v. Driehaus*, 814 F.3d 466 (6th Cir. 2016), the Sixth Circuit considered an Ohio law – Ohio R.C. § 3517.21(B)(10) – whose provisions were nearly identical to N.C. Gen. Stat. § 163-274(a)(9) (as well as a companion law concerning statements about voting records). The Ohio statute made it a crime to "[p]ost, publish, circulate, distribute, or otherwise disseminate a false statement concerning a candidate, either knowing the same to be false or with reckless disregard of whether it was false or not, if the statement is designed to promote the election, nomination, or defeat of the candidate."

The court, following *Alvarez*, ultimately struck down the Ohio laws as "content-based restrictions that burden core protected political speech and [which] are not narrowly tailored to achieve the state's interest." 814 F.3d at 469.

In so holding, the Sixth Circuit found that "Ohio's political false-statements laws target speech at the core of First Amendment protections – political speech." 814 F.3d at 473. The laws reached "not only defamatory and fraudulent remarks, but *all* false speech regarding a political candidate, even that which may not be material, negative, defamatory, or libelous." *Id*. (emphasis in original). As a result, "strict scrutiny" was the appropriate level of review for the challenge. *Id*. That standard rendered the law "presumptively unconstitutional" such that it could only survive if it served "a compelling state interest" and was "narrowly tailored to achieve that interest." *Id*. The Sixth Circuit found that the law met the first test by "protecting voters from confusion and undue influence, and

13

"ensuring that an individual's right to vote is not undermined by fraud in the election process." *Id*. (internal quotation omitted). The law, however, failed the second test.

In that regard, the court found that the Ohio laws did not "pass constitutional muster because they are not narrowly tailored in their (1) timing, (2) lack of a screening process for frivolous complaints, (3) application to non-material statements, (4) application to commercial intermediaries, and (5) over-inclusiveness and under-inclusiveness." 814 F.3d at 474. (*See* Gerhardt Decl. ¶ 7(i).)

With regard to timing, the court found that there was "no guarantee the administrative or criminal proceedings will conclude before the election or within time for the candidate's campaign to recover from any false information that was disseminated." 814 F.3d at 474. The frivolous complaint issue arose from the fact that they were not restricted "to state officials who are constrained by explicit guidelines or ethical obligations," but could be made by "political opponents." *Id*. The failure of the statute to facially exclude non-material falsehoods, rendered the statute "not narrowly tailored to preserve fair elections." *Id*. at 475. The court also found fault that the statute applied "not only to the speaker of the false statement," but also potentially to "commercial intermediaries." *Id*. Finally, the Sixth Circuit found the law "both over-inclusive and underinclusive," by virtue of the fact that it could damage an accused campaign while at the same time failing to timely penalize an offender. *Id*.

In *281 Care Committee v. Arneson*, 766 F.3d 774 (8th Cir. 2014), the Eighth Circuit found a similar Minnesota law unconstitutional on nearly identical grounds, finding that "a credible threat of prosecution" led to an impermissible chilling of political speech. *Id*. at

14

781. The following year, the Supreme Judicial Court of Massachusetts struck down that State's cognate law using a strict-scrutiny analysis and rejecting the State's "attempt to shoehorn [the challenged law] into the exception for defamatory speech." *Commonwealth v. Lucas*, 472 Mass. 387, 395 (2015). (Even before *Alvarez*, in 2007, the Supreme Court of Washington struck down its version of the law in *Rickert v. State*, 161 Wash. 2d 843 (2007), finding that the "mere threat of such a process will chill political speech." *Id*. at 855. (*See* Gerhardt Decl. ¶ 7(j).)

In sum, as outlined by Professor Gerhardt, and as shown by the pertinent post-*Alvarez* precedent concerning challenges to attempts to regulate political campaign speech, Plaintiffs have shown a likelihood of success on their constitutional challenge to the Statute.

### III. IRREPARABLE HARM TO PLAINTIFFS

Deprivation of a constitutional right, even for a short period of time, constitutes irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). "When the harm alleged by the plaintiff is the deprivation of a constitutional right, the likelihood of success on the merits is so "inseparably linked" to the proving of an actual harm that the court may proceed directly to consider the merits of the plaintiff's action." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 511 (4th Cir.2002) (internal quotation marks omitted). As a general rule, "the denial of a constitutional right ... constitutes irreparable harm for purposes of equitable jurisdiction." *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987).

## IV. THE BALANCE OF EQUITIES IS IN FAVOR OF PLAINTIFFS

The likelihood of success on the merits is the first and primary factor to analyze when considering a motion for preliminary injunction on constitutional claims. *Giovani Carandola, Ltd.*, 303 F.3d at 511. If this Court finds Plaintiffs are likely to succeed on the merits, it will necessarily have found that the Statute is unconstitutional on the basis of Plaintiffs' claims. In that circumstance, the balance is necessarily in favor of Plaintiffs.

## V. THE PUBLIC INTEREST FAVORS ISSUANCE OF THE PRELIMINARY INJUNCTION

Upholding constitutional rights serves the public interest. *Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003). In contrast, the public interest is harmed when unconstitutional statutes are enforced and used against those seeking to lawfully exercise their constitutional rights.

## **CONCLUSION**

For the reasons stated herein, Plaintiffs respectfully requests that Defendants be preliminarily enjoined from enforcing N.C. Gen. Stat. § 163-274(a)(9).

This the 21st day of July, 2022.

By: /s/ Pressly M. Millen
Pressly M. Millen
State Bar No. 16178
Raymond M. Bennett
State Bar No. 36341

OF COUNSEL:

WOMBLE BOND DICKINSON (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, North Carolina 27601

(919) 755-2100

Attorneys for Plaintiffs
Juliette Grimmett, Ralston Lapp Guinn Media Group,
and the Josh Stein for Attorney General Campaign