UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

No. 1:22-CV-568

| | |
|---|---|
| JULIETTE GRIMMETT, RALSTON LAPP GUINN MEDIA GROUP, and the JOSH STEIN FOR ATTORNEY GENERAL CAMPAIGN, <br><br> Plaintiff, <br><br> v. <br><br> N. LORRIN FREEMAN, in her official capacity as District Attorney for the 10th Prosecutorial District of the State of North Carolina, <br><br> Defendant. | **MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |

NOW COMES Defendant N. LORRIN FREEMAN, in her official capacity as District Attorney for the 10th Prosecutorial District, and respectfully submits this opposition to Plaintiff's Motion for Preliminary Injunction.

## FACTS

Plaintiffs bring this lawsuit for declaratory judgment seeking a ruling that North Carolina General Statute §163-274(a)(9) is unconstitutional on its face and as applied "to these facts" (DE-1 at 3), and further seek to enjoin the Office of the District Attorney for the 10th Prosecutorial District from presenting any matters to the grand jury relating to a political advertisement run by the Joshua Stein campaign for

Attorney General in August through October 2020, referenced in the Complaint (hereinafter "the Stein Political Ad").

## I.     The Stein Political Ad.

Joshua Stein was a candidate for reelection for the office of Attorney General in the November 2020 campaign.   His opponent was Jim O'Neill, the elected district attorney of Forsyth County.   During the period August through October 2020, his political campaign ran the Stein Political Ad, a television commercial run throughout the State in which one of the plaintiffs, a survivor of sexual assault who was also an employee of Stein's office (Ex. A, ¶6(f)), made the following statement:

> As a survivor of sexual assault that means a lot to me and when I learned that Jim O'Neill left 1,500 rape kits [sitting] on a shelf leaving rapists on the street, I had to speak out.

(DE-1 at 8).  Stein and others in his campaign were personally aware of the content of the Stein Political Ad.  (Ex. A, ¶6(k)).  Plaintiffs' Complaint spends considerable time arguing that the ad is not false.  (DE-1 at 18-26).

## II.    How Sexual Assault Evidence Collection Kits ("SAECKs") Are Handled Under North Carolina Law.

The State Crime Lab is under the authority of the Attorney General. (Ex. A, ¶4).   Attached as Exhibit B is the declaration of William Hart, a lifelong public servant and lawyer who served as the Sexual Assault Kit Initiative Site Coordinator at the State Crime Lab in 2019 until October 2020, when he resigned over concerns about the falsity of the Stein Political Ad.   Mr. Hart's declaration outlines the evolution of how SAECKs are handled under North Carolina law.   Relevant to Plaintiffs' allegations, Mr. Hart's declaration establishes (a) that a long and detailed

2

process was developed during the period 2017 through 2020 for the handling of untested SAECKs in possession of law enforcement throughout the State, pursuant to the laws passed by the General Assembly, and (b) that when testing of the SAECKs began after the appropriate protocols were developed, it was required that the SAECKs be submitted in batches, meaning that no law enforcement agency could submit all of their untested SAECKs at one time.

Attached as Exhibit C is State Crime Lab's the "2017 SAECK Law Enforcement Inventory Report" reflecting the results of this inventory. This report showed that a total of 1,509 untested SAECKs were in the possession of five law enforcement agencies in Forsyth County at that time. Approximately 1/3 of these 1,509 untested SAECKs were matters wherein the subject admitted the sexual encounter, meaning that the SAECKs were not eligible for submission to the State Crime Lab prior to 15 October 2018 without approved deviation from policy by the Lab. Notably, these SAECKs were in possession of the <u>law enforcement agencies</u> in Forsyth County, not the District Attorney's office. There is no provision in North Carolina law giving an elected district attorney authority to order a law enforcement agency to do anything.

Thus, relevant to Plaintiffs' claims, (a) all untested SAECKs were in possession of law enforcement officers, not any district attorney; and (b) any untested SAECKs in law enforcement possession could not just be submitted wholesale to the State Crime Lab or contracted labs for testing, but rather had to be submitted in batches according to the developed protocol.

### III. The SBI Investigation Revealing the Falsity of the Political Advertisement.

In June 2021, a criminal investigation was initiated by the NCSBI, at the request of Defendant, into the Stein Political Ad. District Attorney Lorrin Freeman recused herself from the matter, and a senior assistant district attorney in her office handles the matter.

Attached as Exhibit A is the declaration of William Marsh, a special agent of the NCSBI. The declaration contains an outline of the information that was gathered during the course of the criminal investigation of the Stein Political Ad. This information is submitted by Defendant in response to the allegations made by Plaintiffs in their Complaint about the Stein Political Ad.

As outlined in the declaration, the criminal investigation produced evidence tending to show (a) that Stein and others in his campaign were aware of the content of the Stein Political Ad, and approved of same; (b) that the Stein Political Ad was false, because an elected district attorney does not possess any untested SAECKs in North Carolina and could not submit all untested SAECKs to the State Crime Lab at one time, because of the protocol for submission in batches that had been put in place by the Crime Lab itself; (c) Stein and others in his campaign were aware of and/or recklessly indifferent to that falsity, given their positions as lawyers and elected officials intricately involved in the legislation creating the SAECK initiative; and (d) the Stein Political Ad was derogatory toward his political opponent.

### IV. The Presentment of the Investigation to the Grand Jury.

4

Given this substantial evidence of violation N.C.G.S. §163-274(a)(9), the prosecutor handling the investigation determined that the appropriate course of action would be to submit a presentment pursuant to N.C.G.S. §7A-271 and §15A-641 to the grand jury, to permit the citizens of Wake County through the grand jury to determine whether or not criminal charges would be appropriate against any other person associated with the Stein Political Ad. The prosecutor informed counsel for Stein and his campaign on 7 July 2022 of the decision to make a presentment the grand jury later in July. (Ex. A, ¶8).

## V.   The TRO and Preliminary Injunction Sought Here to Interfere With the Grand Jury's Review of the Matter.

This action was filed on 21 July 2022, just days before the presentment was to take place, and Plaintiffs obtained a temporary restraining order preventing Defendant from submitting this investigation to the citizens of Wake County for their consideration. Plaintiffs now seek a preliminary injunction that will have the same effect, and would likely cause this matter to never be reviewed by a grand jury due to the running of the statute of limitations, as explained herein.

## ARGUMENT

Plaintiffs claim that the publication of a knowingly false political advertisement, designed to be derogatory toward the opponent of the candidate offering the ad, is completely protected by the First Amendment. In essence, Plaintiffs argue that political candidates in North Carolina are permitted to purposefully lie about their opponent to gain an advantage over their opponent in an election, and are protected by the First Amendment to do so. This cannot be the law.

5

## I. Legal Standard.

A preliminary injunction is an "extraordinary remedy" involving the exercise of a very far-reaching power that is only to be employed in limited circumstances. *Winter v. National Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). The party seeking a preliminary injunction bears the burden justifying such relief. *Wagner v. Board of Education of Montgomery County*, 335 F.3d 297, 302 (4th Cir. 2003).

To obtain a preliminary injunction, the party seeking relief must establish: "(1) that [it] is likely to succeed on the merits, (2) that [it] is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "[A] clear showing" of likelihood of success on the merits and irreparable harm is required in addition to satisfying the other required factors before a preliminary injunction may be entered. *Capital Associated Industries, Inc. v. Cooper*, 129 F. Supp.3d 281, 288 (M.D.N.C. 2015).

## II. Likelihood of Success on the Merits.

A facial challenge to the constitutionality of a statute requires establishing "that no set of circumstances exists under which the [statute] would be valid, i.e., that the law is unconstitutional in all of its applications." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008). Facial challenges to statutes are "disfavored." *Id.* at 450.

The statute at issue in this case is N.C.G.S. §163-274(a)(9) (hereinafter "the Statute"), which makes the following a Class 2 misdemeanor:

6

> For any person to publish or cause to be circulated derogatory reports with reference to any candidate in any primary or election, knowing such report to be false or in reckless disregard of its truth or falsity, when such report is circulated or intended to affect the chances of such candidate for nomination or election.

## A. The Statute is Facially Valid Under the First Amendment.

Plaintiffs rely principally on three cases -- *United States v. Alvarez*, 567 U.S. 709 (2012), *Susan B. Anthony List v. Driehaus*, 814 F.3d 466 (6th Cir. 2016), and *281 Care Committee v. Arneson*, 766 F.3d 774 (8th Cir. 2014) -- to argue that the Statute is facially unconstitutional. None of these cases invalidate the Statute. The Statute is materially different than the laws at issue in each of these cases, and the Statute regulates the narrow category of political speech that can and should be regulated consistent with the First Amendment under Supreme Court precedent.

### 1. The Statute is Constitutional Under *Alvarez*.

*Alvarez* involved a First Amendment challenge to the Stolen Valor Act, 18 U.S.C. §704(b), which states: "Whoever, with intent to obtain money, property, or other tangible benefit, fraudulently holds oneself out to be a recipient of a decoration or medal described in subsection (c)(2) or (d) shall be fined under this title, imprisoned for not more than one year, or both."

The Supreme Court found the statute unconstitutional under the First Amendment and reversed the conviction. Beginning with the principle that "content-based restrictions on speech have been permitted, as a general matter, only when confined to the few historic and traditional categories of expression long familiar to the bar", 567 U.S. at 717 (citations and quotations omitted), a plurality of the Court

7

rejected the Government's position that "false statements have no value and hence no First Amendment protection," 567 U.S. at 718, noting:

> Absent from those few categories where the law allows content-based regulation of speech is any general exception to the First Amendment for false statements. This comports with the common understanding that some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee.

567 U.S. at 718 (citations omitted).

In so noting, however, the *Alvarez* plurality did identify <u>defamation</u> as one of the "traditional categories of expression" subject to allowable content-based restrictions. The *Alvarez* plurality specifically identified the knowledge element necessary to comply with the First Amendment:

> Even when considering some instances of defamation and fraud, moreover, the Court has been careful to instruct that falsity alone may not suffice to bring the speech outside the First Amendment. The statement must be a knowing or reckless falsehood. *See [New York Times v.] Sullivan, supra*, at 280, 84 S.Ct. 710 (prohibiting recovery of damages for a defamatory falsehood made about a public official unless the statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not"); *see also Garrison [v. Louisiana], supra*, at 73, 85 S.Ct. 209 ["[E]ven when the utterance is false, the great principles of the Constitution which secure freedom of expression ... preclude attaching adverse consequences to any except the knowing or reckless falsehood"); *Illinois ex rel. Madigan v. Telemarketing Associates, Inc.*, 538 U.S. 600, 620, 123 S.Ct. 1829, 155 L.Ed.2d 793 (2003) ("False statement alone does not subject a fundraiser to fraud liability").

567 U.S. at 719. *Alvarez* therefore makes clear that (1) not all false speech is constitutionally protected, and (2) defamatory speech made with knowledge of its falsity continues to <u>not</u> be protected by the First Amendment.

8

The Statute fully complies with this requirement. First, the Statute criminalizes not merely false, but "derogatory" false expressions. Second, the Statute requires proof that the "derogatory" report be made "knowing such report to be false or in reckless disregard of its truth or falsity." Accordingly, the Statute complies fully with the mandates of *New York Times v. Sullivan*, 376 U.S. 254 (1964) and *Garrison v. Louisiana*, 379 U.S. 64 (1964) requiring proof of such a knowledge requirement to comply with the First Amendment. Nothing in *Alvarez* invalidates the Statute -- to the contrary, the Statute is constitutionally valid under *Alvarez*, because it complies with its requirements. *See State v. Petersilie*, 432 S.E.2d 832 (N.C. 1993) (finding separate subsection of §163-274 constitutional).

### 2. Numerous Cases Have Upheld Regulations on Knowingly False Political Speech After *Alvarez*.

*Alvarez* is not the deathknell for regulation of political speech claimed by Plaintiffs. Consistent with the Statute's constitutionality, a number of cases have upheld regulations on political speech against First Amendment challenges after *Alvarez*:

(1)     *Make Liberty Win v. Cegavske*, 570 F.Supp.3d 936 (D. Nev. 2021) and 499 F.Supp.3d 794 (D. Nev. 2020) -- district court rejects facial challenge to Nevada law prohibiting use of the word "reelect" under certain circumstances in campaign activities, distinguishing *Driehaus*, while finding as applied challenge meritorious;

(2)     *Linert v. MacDonald*, 901 N.W.2d 664 (Minn. App. 2017) -- Minnesota Court of Appeals rejects facial challenge to state law making it illegal for a

9

person to knowingly make a false claim that the candidate had the support of a major political party;

(3)   *Myers v. Thompson*, 192 F.Supp.3d 1129 (D. Mt. 2016) -- federal district court upholds Montana state bar rule prohibiting lawyers from making knowingly false statements about the "qualifications or integrity" of a judge or judicial candidate over facial challenge;

(4)   *Winter v. Wolnitzek*, 834 F.3d 681 (6th Cir. 2016) -- Sixth Circuit addresses First Amendment challenges to multiple sections of Kentucky canons of judicial conduct and how they apply to judicial office candidates; upholds some sections and finds others unconstitutional; as to canon prohibiting judicial candidate from knowingly making false statements during campaign, Sixth Circuit distinguishes *Driehaus* and finds cannon facially constitutional.

All of these cases confirm that knowingly false and material political speech is not protected by the First Amendment and can be constitutionally regulated. The Statute regulates just that.

### 3.   *Driehaus* Is Distinguishable From This Case.

In *Driehaus*, the Sixth Circuit found Ohio's political false statement laws unconstitutional under the First Amendment. But there are important differences between the Statute and the laws at issue in *Driehaus*.

The Ohio law at issue in *Driehaus* was described by the Sixth Circuit as follows:

Ohio's political false-statements laws prohibit persons from disseminating false information about a political candidate in campaign

materials during the campaign season "knowing the same to be false or in reckless disregard of whether it was false or not, if the statement is designed to promote the election, nomination, or defeat of the candidate. Ohio Rev.Code §3517.21(B)(10). The statutes specifically prohibit false statements about a candidate's voting record, but are not limited to that. *See* Ohio Rev.Code §3517.21(B)(9-10). "Campaign materials" are broadly defined as, but not limited to, "sample ballots, an advertisement on radio or television or in a newspaper or periodical, a public speech [or] press release." Ohio Rev.Code §3517.21(B).

814 F.3d at 469-70. The law has a "three-step process to be convicted of the crime of making a political false statement," involving an initial probable cause review by a panel of the state elections commission, followed by an "adjudicatory hearing" before the full commission, followed by a referral to a prosecutor for state court criminal proceedings. *Id.* at 470.

Applying a strict scrutiny standard because the Ohio law involved political speech, the Sixth Circuit first acknowledged that Ohio had a compelling state interest in preserving the "integrity of its elections" and in protecting voters from confusion and fraud. 814 F.3d at 473 (citations omitted). But it concluded that "Ohio's laws do not pass constitutional muster because they are not narrowly tailored in their (1) timing, (2) lack of a screening process for frivolous complaints, (3) application to non-material statements, (4) application to commercial intermediaries, and (5) over-inclusiveness and under-inclusiveness." *Id.* at 474.

The Statute, because both of the differences in its text and the differences in North Carolina procedure, does not suffer the infirmities relied on by the Sixth Circuit, rendering *Dreihaus* distinguishable.

        a.    Timing

11

The Sixth Circuit first found the Ohio law not narrowly tailored because "there is no guarantee the administrative or criminal proceedings will conclude before the election or within time for the candidate's campaign to recover from any false information that was disseminated," and because "a preelection probable cause finding … itself may be viewed … as a sanction by the State that triggers profound political damage." 814 F.3d at 474 (citations omitted).

Notably, the *Driehaus* court cites to no precedent from the United States Supreme Court (or elsewhere) in its "timing" discussion. In any event, any timing concerns regarding the Statute here are minimal, given that a prosecution under North Carolina law directly serves the compelling state interest embodied in the Statute of preserving integrity in elections by barring candidates and others from knowingly making <u>derogatory</u> false statements about a candidate. These knowingly false derogatory statements can be regulated under *Sullivan* and *Alvarez*. It is difficult to understand how that compelling state interest could be minimized simply because the prosecution occurs after, rather than before, the affected election. This compelling state interest is served any time that an offender is penalized.

b. Screening

Next, the Sixth Circuit took issue with the Ohio law's failure "to screen out frivolous complaints prior to a probable cause hearing." 814 F.3d at 474-75.

No such problem exists under North Carolina law. Misdemeanor violations like the type at issue in the Statute can be brought by warrant (which can only be issued by a judicial officer after a finding of probable cause), or by presentment to the

12

grand jury (whereby citizens in the grand jury would make a finding of probable cause). North Carolina law does not "provide[] frivolous complainants an audience" or "require[] purported violators to respond to a potentially frivolous complaint" like the Ohio law does. *Driehaus* is plainly distinguishable on this basis.

c.    Application to All False Statements

Next, the Sixth Circuit found fault in the Ohio law in its application "to *all* false statements, including non-material statements." 814 F.3d at 475. Again, the Statute suffers from no such infirmity. The Statute criminalizes only knowing "derogatory reports" that are "calculated or intended to affect the chances" of the candidate that is the subject of the statements. This final requirement -- that the derogatory statement about the candidate be "calculated or intended to affect the chances" of that candidate in the election, is the materiality requirement in North Carolina law that the Sixth Circuit found lacking in the Ohio law. Moreover, by targeting only "derogatory" false statements, the Statute complies with the Supreme Court's mandate that the targeted speech fall into a category not traditionally protected by the First Amendment. Again, *Driehaus* is plainly distinguishable on this basis.

d.    Application to Commercial Speakers

Next, the Sixth Circuit took issue with the Ohio law because it could apply not just to the maker of the false statement but also commercial intermediaries, and "prosecuting a billboard company executive, who was simply the messenger, is not narrowly tailored to preserve fair elections." 814 F.3d at 475.

13

In reaching this conclusion, the Sixth Circuit fails to acknowledge that a commercial intermediate could only be prosecuted if it knew or was recklessly indifferent to the falsity of the political speech at issue (unlikely given its position). In any event, a facial challenge to a law's constitutionality requires the challenger to establish "that no set of circumstances exists under which the [statute] would be valid, i.e., that the law is unconstitutional in all of its applications." *Washington State Grange*, 552 U.S. at 449. When applied to candidates or employees of a political campaign, the Statute avoids this issue entirely. *Driehaus* is plainly distinguishable on this basis.

### e.   Overinclusiveness and Underinclusiveness

Next, the Sixth Circuit found the Ohio law constitutionally infirm because it is both overinclusive -- "[c]ausing damage to a campaign that ultimately may not be in violation of the law, through a preliminary probable cause ruling, does not preserve the integrity of elections" -- and underinclusive -- "the law may not timely penalize those who violate it, nor does it provide for campaigns that are the victim of potentially damaging false statements." 814 F.3d at 475.

A statute that limits speech is unconstitutionally overbroad "if a substantial amount of protected speech is prohibited or chilled" by the state's constitutional application of a statute. *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002). To violate the Constitution, however, the overbreadth must be "substantial ... relative to the statute's plainly legitimate sweep." *United States v. Williams*, 553 U.S. 285, 292 (2008). A statute is not invalid merely because a challenger can

14

envision circumstances in which the statute might be applied unconstitutionally -- to the contrary, the challenger must demonstrate "from the text [of the law] and from actual fact that a substantial number of instances exist in which the Law cannot be applied constitutionally." *N.Y. State Club Association v. City of New York*, 487 U.S. 1, 14 (1988).

That cannot be done as to the Statute. By limiting its scope only to "derogatory reports" made with knowledge or reckless disregard of their falsity, the Statute applies to less political speech than the Ohio law, and applies to speech permissibly regulated under *Sullivan* and *Alvarez*. Moreover, the Statute does not implicate any of the dangers identified by the Sixth Circuit with the three-step probable cause process under the Ohio law. The Statute criminalizes only a very narrow category of political speech, and that speech is in a category not traditionally protected by the First Amendment -- defamation. There are no overinclusiveness issues with the Statute.

In sum, *Driehaus* does not control and is readily distinguishable.

### 4. *Arneson* Is Distinguishable From This Case.

In *211 Care Committee v. Arneson*, 766 F.3d 774 (8th Cir. 2014), the Eighth Circuit held a Minnesota election law unconstitutional under the First Amendment. The Minnesota law at issue states:

> A person is guilty of a gross misdemeanor who intentionally participates in the preparation, dissemination, or broadcast of paid political advertising or campaign material … with respect to the effect of a ballot question, that is designed or tends to … promote or defeat a ballot question, that is false, and that the person knows is false or communicates to others with reckless disregard of whether it is false.

15

766 F.3d at 778.  Applying a strict scrutiny analysis, the Eighth Circuit acknowledged the compelling interest of Minnesota in preventing fraud and protecting the "integrity of its electoral process," but found that the statute was not narrowly tailored to that goal.  766 F.3d at 786-87.  In reaching this conclusion, the Eighth Circuit focused on several factors:  (1) that under the Minnesota law, "anyone" could lodge a complaint alleging violation of the law, which could result in the filing of complaints for political purposes "at a tactically calculated time", which in turn could chill speech and made the law overbroad, 766 F.3d at 791-92, (2) counterspeech is available and given the issues with the law, is likely the least restrictive means to satisfy the state interest; and (3) certain exceptions to the Minnesota law made the law underinclusive.  766 F.3d at 793-95.

None of these issues exist with respect to the Statute here.  First, by its narrower text the Statute is very different than the Minnesota law, which applied to all "false" political speech.  Second, the procedural morass and dangers of manipulation focused on by the Eighth Circuit as being present in the Minnesota law have no application as to the Statute -- a prosecution under the Statute can be brought only after a finding of probable cause by a judicial official or grand jury.  And none of the exceptions present in the Minnesota law are present in the Statute.

The notion discussed in *Arneson* that prosecution under a statute could chill speech has been rejected by other courts, where, as here, there are sufficient procedural protections under relevant law.  *Linert*, 901 N.W.2d at 670 (Minn. App. 2017).  And other courts have rejected the notion that counterspeech is always

16

effective in the political arena.  *See Myers*, 192 F.3d at 1140-41 (D. Mt. 2016) (rejecting counterspeech as effective where false statements affected judicial elections).  Like *Driehaus, Arneson* involves a very different law and procedure than the Statute.

## B.      The Statute Is Constitutional.

In sum, Plaintiffs have failed to show a likelihood of success on the merits.  The majority of the issues identified in *Driehaus* with the Ohio law arise from (a) the unique Ohio procedure for dealing with complaints under the Ohio law, which does not apply here, and (b) the fact that the Ohio statute is markedly broader than the Statute here.  *Arneson* deals with a Minnesota law with the same issues.  Plaintiffs cite to no case involving a statute like the Statute here -- that applies only to knowingly false "derogatory" statements about a candidate specifically "calculated or intended to affect the chances of such candidate for nomination or election."  Under *Sullivan* and *Alvarez*, regulation of such "derogatory" speech is constitutional.

The Court inquired as to whether there could be a state criminal libel statute that did not violate the First Amendment.  *Garrison* and *Alvarez* plainly answer that question "Yes" -- so long as the statute incorporates an actual knowledge of falsity or reckless disregard element.  In *Garrison*, the Court held that criticisms of public officials were relevant and worthy of protection under the First Amendment.  However, the Court drew a clear distinction between criticism and intentional lies about political officials, finding the latter to be not worthy of constitutional protection:

> The use of a calculated falsehood, however, would put a different cast on
> the constitutional question.   Although honest utterance, even if
> inaccurate, may further the fruitful exercise of the right of free speech,

17

it does not follow that the lie, knowingly and deliberately published about a public official, should enjoy a like immunity.

*Garrison*, 379 U.S. at 75. The *Garrison* court noted the particular danger false speech constitutes in the political arena:

> That speech is used as a tool for political ends does not automatically bring it under the protective mantle of the Constitution. For the use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected.

*Id.* Nothing in *Alvarez* changes this result. In fact, *Alvarez* only reaffirms this principle, citing *Garrison* for the notion that knowingly made false statements can be actionable as defamation or fraud and not protected by the First Amendment. *Alvarez*, 567 U.S. at 719. Numerous states continue to have various types of criminal libel statutes on the books, though it appears they are rarely invoked.

The Statute here complies with *Garrison*'s requirements, undoubtedly serves a compelling state interest, and is narrowly tailored to do so by focusing on "derogatory" speech. Even under strict scrutiny, the Statute is constitutional. Any alleged infirmities with the Statute can be dealt with on an as-applied basis. *Broadrick v. Oklahoma*, 413 U.S. 601, 615-16 (1973). Knowingly false and derogatory statements made by one candidate against another, for the purpose affecting the candidate's chances in the election, are not protected by the First Amendment. Nor should they be.

### III. Irreparable Harm.

Plaintiffs also fail to establish irreparable harm. First, the Supreme Court has made clear that facing a criminal charge is not "irreparable harm" as that term is

18

used in equity. The "cost, anxiety, and inconvenience of having to defend against a single criminal prosecution, could not by themselves be considered 'irreparable' in the special legal sense of that term." *Younger v. Harris*, 401 U.S. 37, 46 (1971). Rather, the harm "must be one that cannot be eliminated by his defense against a single criminal prosecution." *Id.; see also Beal v. Missouri Pacific R.R. Corp.*, 312 U.S. 45, (1941); *Gilliam v. Foster*, 75 F.3d 881, 904 (4th Cir. 1996) ("[O]rdinarily irreparable harm cannot be shown simply because a defendant will be subject to a single criminal prosecution in which he must raise any constitutional claims he wishes as a defense to his conviction"). Thus, the prospect of facing criminal indictment is not irreparable harm. And if the grand jury were to return an indictment for violation of the Statute against any person, that person would have the opportunity to litigate the constitutionality of the Statute in that criminal case. *See, e.g. Petersilie*, 432 S.E.2d at 837-38 (N.C. 1993).

Plaintiffs argue that the irreparable harm standard is met automatically by proof of likelihood of success on the merits, citing cases that stand for the proposition that "the denial of a constitutional right … constitutes irreparable harm for the purposes of equitable jurisdiction." (DE-6 at 15).

But the cases cited by Plaintiffs in support of that proposition are very different than this case. In those cases, the parties seeking injunctive relief sought to enjoin the ongoing violation of their constitutional rights by interference with their current, ongoing conduct. *See Elrod v. Burns*, 427 U.S. 347, 351 (1976) (lawsuit challenging ongoing practice of sheriff of dismissing employees on a partisan basis; plaintiff "in

imminent danger of being discharged solely for the same reasons"); *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507 (4th Cir. 2002) (lawsuit to enjoin state from taking liquor license from "nude dancing establishment" due to its ongoing nude dancing performances); *Ross v. Meese*, 818 F.2d 1132 (4th Cir. 1987) (lawsuit by subject of search to prevent Government's "using or disseminating the material and information" seized during illegal search of plaintiff's home); *Stuart v. Huff*, 834 F.Supp.2d 424 (M.D.N.C. 2011) (lawsuit to enjoin new requirements imposed on doctors by new state law prior to performing abortions).

This case, on the other hand, involves only whether the Stein Political Ad, which last ran almost two years ago, is protected by the First Amendment despite its false and derogatory nature. This examination of <u>past</u> conduct is very different than the ongoing deprivation of constitutional rights alleged in the cases cited by Plaintiffs. Plaintiffs cite to no case where irreparable harm is established by a <u>past</u> alleged violation of constitutional right that is not ongoing. Plaintiffs have failed to establish irreparable harm.

## IV. Balancing of Equities.

In considering whether to grant a preliminary injunction, the court must consider any harm that may come to the defendant as a result of the requested relief and balance the equities. *See, e.g. Capital Associated Industries*, 129 F.Supp.3d at 298. Irreparable harm to Defendant will inure from the granting of any preliminary injunction.

20

Under North Carolina law, misdemeanor crimes are subject to a two-year statute of limitations. N.C.G.S. §15-1. Thus, the statute of limitations for any violation of the Statute arising out of the Stein Political Ad runs on the last date it was aired, which is on or about 5 October 2020. (Ex. A, ¶5). Plaintiffs and those associated with them, advised by very able counsel, are undoubtedly aware of this fact.

It is equally indisputable that Plaintiffs and others associated with the Stein campaign have been aware that there has been a criminal investigation relating to the Stein Political Ad since August 2021. Plaintiff Grimmett was interviewed by the SBI on 26 August 2021. (DE-1 at 16). Stein himself was interviewed by the SBI on 22 December 2021. Counsel for Stein and the campaign were present during the interviews. And counsel for Stein and the campaign (also counsel to Plaintiffs in this lawsuit) were in contact with the assistant district attorney handling the investigation since August 2021 regarding the matter. Plaintiffs' counsel were informed on 7 July 2022 of the final decision of the prosecutor handing the matter to make a presentment to the grand jury to let the citizens of Wake County decide if criminal charges under the Statute were warranted against any person. (Ex. A, ¶6,8).

Yet despite knowing of the existence of this investigation and the possibility of criminal charges under the Statute against one or more persons associated with the Stein Political Ad for almost a year, Plaintiffs made the decision to wait to do anything until this lawsuit was filed on 21 July 2022. Not coincidentally, by choosing to wait this long, Plaintiffs, if able to obtain a preliminary injunction, will effectively

bar prosecution of any person under the Statute for the Stein Political Ad, because the statute of limitations will likely run prior to the end of any appeal of entry of any such injunction.

Fourth Circuit precedent counsels directly against rewarding such a course of conduct. Where a plaintiff has knowledge of the facts necessary to bring an action seeking injunctive relief, but delays doing so to the detriment of the defendant's position, preliminary injunctive relief is not warranted. *Quince Orchard Valley Citizens Association, Inc. v. Hodel*, 872 F.2d 75, 79 (4th Cir. 1988). In *Quince*, the plaintiffs sought an injunction to prevent construction of a new road. The plaintiffs waited for six months after approval of the final permit necessary for construction to bring its action, waiting until construction was imminent. The defendant asserted prejudice from this delay, because "any delay could significantly increase construction costs and interfere with contractual obligations" with contractors. 872 F.2d at 79. The Fourth Circuit affirmed the district court's denial of the motion for preliminary injunction, relying on the district court's finding that "[a]ll the facts that the Plaintiffs [Associations] needed to bring this action were known to them at least six months before they requested preliminary relief. … Whatever irreparable harm Plaintiffs face from the impending construction along Alternate 2A is very much the result of their own procrastination." *Quince*, 872 F.2d at 79 (emphasis added).

This and other courts apply the same principles to deny injunctive relief. *Mooreforce, Inc. v. U.S. Department of Transportation*, 243 F.Supp.2d 425, 435 (M.D.N.C. 2003) (denying injunctive relief where plaintiff "waited until the last

possible moment before they requested intervention from the Court"); *National Council of Arab Americans v. City of New York*, 331 F.Supp.2d 258, 265-66 (S.D.N.Y. 2004) (denying preliminary injunction where plaintiff knew of facts necessary to bring action for one and one-half years and waited until 15 days before demonstration at issue to bring lawsuit, holding that "the emergency created by this preliminary injunction application is of Plaintiffs' making"). All of these decisions counsel against granting preliminary injunctive relief where, as here, a plaintiff has known of the facts necessary to obtain a determination of its rights for some period of time, but chooses to delay in doing so to the detriment of the defendant.[1]

In sum, Defendant will likely be irreparably harmed by the granting of a preliminary injunction -- the statute of limitations on any violation arising from the Stein Political Ad would likely run before the end of any appellate review of an injunction. Any person who ultimately may be indicted by the grand jury for violation of the Statute arising from the Stein Political Ad, on the other hand, loses nothing if injunctive relief is denied. Any such person still retains the right and ability to raise the defense of alleged unconstitutionality of the Statute in any such state criminal proceeding. *See, e.g. Petersilie*, 432 S.E.2d at 837-38 (N.C. App. 1993). Given the

---

[1] It should also be noted that the Office of the District Attorney was under no legal obligation to inform Plaintiffs' counsel of its timetable in presenting this matter to the grand jury or to engage in discussions with Plaintiffs' counsel about its intentions in the matter. Because a preliminary injunction is an equitable remedy, Defendant respectfully requests that the Court consider the fact that issuance of an injunction will effectively penalize Defendant for acting in good faith and candor with counsel for the subject of the criminal investigation. Neither the profession nor the public interest would benefit from discouraging these types of good faith discussions between counsel.

23

delay in this matter coming before this Court, which is caused solely by Plaintiffs' decision as to when to file this action, the balance of equities weighs against issuance of a preliminary injunction.

## V.     Public Interest.

Finally, the public interest is served by denial of the preliminary injunction. During an election campaign, "false statements, if credited, may have serious adverse consequences for the public at large" and therefore a state has a compelling interest in preventing "fraud and libel" in an election. *McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 349 (1995). Plaintiffs' efforts to enjoin Defendant from doing its work and duty in presenting the matters relating to the Stein Political Ad to the grand jury directly conflicts with this strong public interest. The public interest weighs against issuance of a preliminary injunction.

## CONCLUSION

For the reasons set out herein, Defendant respectfully requests that Plaintiffs' motion for preliminary injunction be denied.

24

This the 1st day of August, 2022.

<div style="margin-left:40%;">

**GAMMON, HOWARD & ZESZOTARSKI, PLLC**

/s/ Joseph E. Zeszotarski, Jr.
Joseph E. Zeszotarski, Jr.
State Bar No. 21310
P.O. Box 1127
Raleigh, NC 27602
(919) 521-5878
jzeszotarski@ghz-law.com

Counsel for Defendant N. Lorrin Freeman, in her official capacity as District Attorney of the 10th Prosecutorial District

</div>

## CERTIFICATE OF WORD COUNT
## PURSUANT TO LOCAL RULE 7.3(d)

Undersigned counsel certifies that this brief complies with Local Rule 7.3(d), in that the word count function of Microsoft Word shows the brief to contain 6,229 words, exclusing those portions of the brief permitted to be excluded by the Rule.

This the 1st day of August, 2022.

**GAMMON, HOWARD & ZESZOTARSKI, PLLC**

/s/ Joseph E. Zeszotarski, Jr.
Joseph E. Zeszotarski, Jr.
State Bar No. 21310
P.O. Box 1127
Raleigh, NC  27602
(919) 521-5878
jzeszotarski@ghz-law.com

Counsel for Defendant N. Lorrin Freeman, in her official capacity as District Attorney of the 10th Prosecutorial District

26