# DECLARATION OF WILLIAM P. HART, SR.

William P. Hart, Sr., declares as follows pursuant to 28 U.S.C. §1746:

1. My name is William P. Hart, Sr. From January 2019 until October 2020, I was employed by the North Carolina Department of Justice and served as the Sexual Assault Kit Initiative (SAKI) site coordinator at the North Carolina State Crime Lab (SCL).

2. Prior to working with the North Carolina State Crime Lab, I was employed with the North Carolina Attorney General's Office from September of 1986 to September 1, 2013. From 1986 through 1995 I was a member of the special prosecution section. From 1995 through 2005 I was the head of the Attorney General's Appellate section. From November 2005 until I retired, I served as the head of the Attorney General's Criminal Division. After my retirement from the Attorney General's Office, I served in the Wake County Sheriff's Office as the Director of Management Services until December 2018. Prior to joining the North Carolina Attorney General's Office, I served as an assistant district attorney in Wake County from February 1979 through September 15, 1986. During this time, I prosecuted rapes and murders.

3. As the SAKI site coordinator, I led the coordination of a team employed by the State Crime Lab that was responsible for working with local law enforcement agencies to locate, track, and test all previously untested Sexual Assault Evidence Collection Kits (SAECK) across the state; coordinated and led the SAKI working group convened to provide guidance throughout the SAKI project to agencies

statewide; oversaw the SAKI grant; and, worked with State Crime Lab personnel, prosecutors, law enforcement agencies, and victim advocacy groups to encourage collaboration in meeting of the objectives of the initiative.

4. Prior to my employment with the North Carolina State Crime Lab, the North Carolina General Assembly, working with the North Carolina Department of Justice, enacted Session Law 2017-57 (Senate Bill 257) in 2017 which directed law enforcement agencies to determine the total number of sexual assault kits in their possession and to catalogue these kits according to the categories set out in the law and to report these results to the North Carolina State Crime Lab.

5. Prior to the enactment of Session Law 2017-57, the number of sexual assault kits held by law enforcement agencies statewide was unknown. Consistent with practices established at the time in North Carolina and elsewhere, the State Crime Lab did not accept for testing sexual assault kits in which an admission of sexual encounter existed without a request for deviation from lab policy. This practice of not testing sexual assault kits in which an admission existed and consent was the legal issue was the practice in efforts to allocate limited lab resources.

6. In March of 2018, the North Carolina Department of Justice and the State Crime Lab issued a report in which they reported the number of previously untested sexual assault kits to be over 15,000 kits and set forth as recommendations the next steps to be undertaken in testing these kits. Specifically, the report called for the creation of a tracking system, bar coding of existing sexual assault kits, the expansion of capacity for the State Crime Lab to test kits including outsourcing some

2

of the testing and development of local jurisdiction committees to review and prioritize those kits that would be submitted for testing. This report led to the enactment of Session Law 2018-70 in June of 2018 which adopted these recommendations and set up a working group led by the Department of Public Safety to make further recommendations regarding the law enforcement agencies' handling of untested sexual assault kits. This working group finalized its work and issued a final report in December of 2018.

7. The North Carolina General Assembly enacted Session Law 2019-221 (The Survivors Act) on September 17, 2019. This act adopted a policy of testing all sexual assault kits and set forth the requirement that local law enforcement agencies working with local multidisciplinary teams review each case associated with an untested sexual assault kit and prioritize the kits for testing. The Survivor Act set forth time frames in which this work was to be done. By March 19, 2020 agencies were to have made their initial determinations regarding their kits.

8. In order to meet the mandates of these initiatives to test all sexual assault kits, the State Crime Lab sought to expand their capacity for testing kits, including seeking and obtaining $2 million dollars in grant funding from the United States Department of Justice Bureau of Justice Assistance (BJA Grant) and contracting with private labs to assist with the testing.

9. A process was established by which a local law enforcement agency would communicate with the State Crime Lab the number of kits to be tested and

3

would await further instructions on the submission of those kits. Agencies submitted requests for the testing of kits in batches.

10. Throughout this initiative, personnel at the State Crime Lab created documents to share with local law enforcement agencies to guide them in their work as they sought to comply with the newly enacted laws. Attached to this declaration as Exhibit 1 is an "Instructions for Requesting Analysis" form developed for submission of kits outlining the protocol for doing so. Attached to this declaration as Exhibit 2 is a chart entitled the "SAECK Project Workflow" showing the process that was developed for submission of kits for testing. As these documents show, the process was developed over time and required consideration of the nature and origin of the kits. The working group and State Crime Lab personnel continued to refine these processes throughout this initiative. Not all kits in possession of a law enforcement agency could be submitted at one time to the State Crime Lab or the private labs that were contracted to do testing.

11. Bode Labs, a private lab in Maryland, was the primary private lab with which the State Crime Lab contracted to conduct testing of sexual assault kits. At one point Bode Labs, notified the State Crime Lab that they could only accept at any given time as many kits as they could test in six months due to storage limitations.

12. Throughout this initiative, a working group of stakeholders continued to meet. Significant discussions were held during these meetings that focused on not assigning blame for the lack of testing previously not conducted. Juliette Grimmett and Seth Dearmin were in the meetings where this philosophy was discussed.

4

13. On September 30, 2020 I saw for the first time in its entirety a campaign ad in which Juliette Grimmett appeared. The ad did not identify her as an employee of the North Carolina Department of Justice. The ad did accuse District Attorney Jim O'Neill of Forsyth County, a candidate for Attorney General of leaving 1500 sexual assault kits on the shelf thereby letting rapists go free. I was disturbed with the content of the ad because the ad was not consistent with the philosophy of the SAKI initiative and was not accurate. That day I notified my supervisor of my concerns and was later informed that my concerns had been shared with the administration at the North Carolina of Justice. On Sunday October 4, 2020, I again saw the ad. I knew at that time that others had come forward publicly denouncing the accuracy of the ad. As a result of this ad, I notified my supervisor that day that I was resigning my position with the North Carolina State Crime Lab and submitted my resignation letter on October 5, 2020.

14. On Tuesday July 20, 2021, I was interviewed by Assistant Special Agent in Charge (ASAC) W. D. Marsh from the North Carolina State Bureau of Investigation regarding this matter.

I declare under penalty of perjury the foregoing to be true and correct.

This the 31st day of July, 2022.

_William P. Hart, Sr._
William P. Hart, Sr.

5



# North Carolina State Crime Laboratory

JOSHUA H. STEIN
ATTORNEY GENERAL

Department of Justice
121 E. Tryon Road
Raleigh, North Carolina 27603

JOHN A. BYRD
DIRECTOR

Sexual Assault Evidence Collection Kit (SAECK) Outsourcing Project

**Instructions for Requesting Analysis**

1. Triage any untested kits in the following order – 1) Stranger rape, 2) possible serial offense, 3) acquaintance rape, 4) domestic related, 5) unsure if assault occurred, 6) Suspect claims act was consensual, 7) cases where consensual/suspect standards not available, 8) cases deemed previously unfounded.
    a. Please note that the decision on which kits to test is ultimately *up to your agency*. The SCL is *not* directing your agency to test *any particular kit or category of kits*, but instead wants to be sure that the older (eligible) kits which your agency desires to test can be tested by the vendor lab using available outsourcing funds.
    b. Note that the SCL will be using AOC record checks as part of its screening process to ensure kits are not tied to adjudicated cases (unless there is a different suspect).
    c. The SCL will not approve for testing any anonymous or "Jane Doe" kits. Additional eligibility criteria may apply during SCL review of request forms.
    d. If you have questions about the circumstances of a specific case, please reach out to the SCL via SAK@ncdoj.gov.
2. Complete the "Sexual Assault Kit Outsourcing Approval and Request Form." One form is required per kit. This form needs to be filled out completely for the kit to be considered for testing.
    a. This form is fillable. Please "Save As" using the following file naming convention: "Agency Name_Agency Case Number.pdf" (*i.e.,* HPPD_2016-12345.pdf)
    b. Please submit the forms in batches of twenty-five via SAK@ncdoj.gov.
    c. The SCL will evaluate each request for outsourcing to determine suitability for testing. In approximately two weeks, you will be notified if your kits are approved for testing. You will also be notified if any additional information is needed.





3. If the SAECK is approved for testing, you will receive the "Sexual Assault Kit Outsourcing Approval and Request Form" in which the "CODIS Approval" has been digitally signed by a member of the SCL.
    a. At that time, you will receive instructions on where and when to ship your approved kits. Please note that your agency will *not* pre-log any outsourcing cases in Forensic Advantage *nor* will any evidence be submitted to the SCL.
    b. Please note that shipping labels will be provided by the vendor DNA laboratory. Your agency will *not* be charged for shipping of kits.
4. If an interpretable DNA profile is developed, the vendor DNA laboratory will submit the DNA report and analytical data for review to the SCL. All eligible DNA profiles will be entered into the Combined DNA Index System (CODIS) Database. The SCL will issue a notification report via FA Web to notify your agency if a DNA profile has been entered or not.
    a. Any subsequent investigative leads will be provided to your agency via FA Web in the form of a "CODIS Hit Notification" report.
5. Once the analysis of the SAECK has been completed, the vendor lab and the agency point of contact will coordinate the return of evidence. Again, no evidence will be shipped to the SCL.

# FB SAECK Project Workflow



