# MEMORANDUM

TO: Joint Legislative Oversight Committee on Justice and Public Safety

FROM: Erik A. Hooks, Secretary *EAH*

RE: Sexual Assault Evidence Collection Kits Working Group Recommendations

DATE: December 1, 2018

Pursuant to Section 3 of Session Law 2018-70, The Secretary of the Department of Public Safety shall convene a working group to make recommendations regarding the testing priority of untested sexual assault kits identified in the 2017 Sexual Assault Evidence Collection Kit Law Enforcement Report made pursuant to Section 17.7 of S.L. 2017-57. The working group shall include representatives from law enforcement, victims' advocates such as the North Carolina Victim Assistance Network and the North Carolina Coalition Against Sexual Assault, RTI International, the North Carolina Department of Justice, prosecutors, and criminal defense attorneys. The working group shall develop findings and recommendations including a strategic plan to (i) establish the order of priority for testing kits; (ii) test all of the kits that can be tested; (iii) direct the preservation of all kits; (iv) suggest sanctions for the destruction or contamination of kits in violation of G.S. 15A-268; and (v) develop statewide protocols to test sexual assault evidence collection kits in the future. The working group statewide protocol for testing future sexual assault evidence collection kits. The working group shall also make findings and recommendations to the Secretary and to the Director with respect to developing the protocols, rules, and guidelines for the System under G.S. 114-65(a). The Secretary shall submit the findings and recommendations of the working group to the Joint Legislative Oversight Committee on Justice and Public Safety by December 1, 2018.



**MAILING ADDRESS:**
4201 Mail Service Center
Raleigh, NC 27699-4201
**www.ncdps.gov**

*An Equal Opportunity Employer*

**OFFICE LOCATION:**
512 N. Salisbury Street
Raleigh, NC 27604
Telephone: (919) 733-2126

**North Carolina Department of Public Safety**
Sexual Assault Evidence Collection Kits Working Group

*Strategic Plan, Findings, and Recommendations*
To the North Carolina General Assembly Joint Legislative Oversight Committee on Justice and Public Safety



Secretary Erik A. Hooks
December 1, 2018
Pursuant to N.C. Session Law 2018-70

# Table of Contents

Working Group Membership........................................................................ii

Background and Legislative Mandate……………………….............…1

Executive Summary......................................................................................3

Strategic Plan, Findings, and Recommendations

       Part 1: SAECK Testing.....................................................................5

       Part 2: SAECK Tracking..................................................................15

       Part 3: SAECK Preservation............................................................17

Conclusion..................................................................................................18

Potential Legislation…………………………………………….Appendix

i

# Working Group Membership

**Secretary Erik A. Hooks**
NC Department of Public Safety

**Jane Ammons Gilchrist**
General Counsel
NC Department of Public Safety

**John A. Byrd**
Director
NC State Crime Laboratory

**Bradford Sneeden**
Legislative Counsel
NC Department of Justice

**Sheriff Carson H. Smith, Jr.**
Pender County
President, NC Sheriffs' Association

**Assistant Chief Ken Quinlan**
Cary Police Department
NC Association of Chiefs of Police

**Honorable Kimberly S. Robb**
District Attorney (3A)
President
NC Conference of District Attorneys

**Amber Lueken Barwick**
Sexual Assault Resource Prosecutor
NC Conference of District Attorneys

**Sarah Rackley Olson**
Forensic Resource Counsel
NC Office of Indigent Defense Services

**Mary Pollard**
NC Prisoner Legal Services
President, NC Advocates for Justice

**Lindsey Guice Smith**
Executive Director
NC Innocence Inquiry Commission
President
NC Association for Property and Evidence

**Monika Johnson Hostler**
Executive Director
NC Coalition Against Sexual Assault

**Jane Allen Wilson**
Director of Training
NC Victim Assistance Network

**Dr. Patricia Melton**
Senior Research Forensic Scientist
Research Triangle Institute International

# Research and Publication Development

Erica G. Romain, Assistant General Counsel, NC Department of Public Safety
William P. Hart, Jr., Assistant Attorney General, NC Department of Justice

# Background and Legislative Mandate

On March 1, 2018, the North Carolina Department of Justice (NCDOJ) and the State Crime Laboratory submitted to the General Assembly the "2017 Sexual Assault Evidence Collection Kit Law Enforcement Inventory Report" pursuant to Section 17.7 of the Appropriations Act of 2017 (N.C. Sess. Law 2017-57).

The March 1, 2018 Report, based upon a 92% response rate from law enforcement agencies in North Carolina, estimated that 15,160 sexual assault evidence collection kits (SAECK or "kit") in law enforcement custody had not previously been submitted for forensic testing.[1] The report also set forth proposals from Attorney General Josh Stein relating to: the testing of previously untested SAECKs; the establishment of a statewide SAECK tracking system; and, the development of protocols for testing new SAECKs going forward.

In response to the March 1, 2018 Report, the General Assembly enacted legislation N.C. Sess. Law 2018-70, which was signed into law by Governor Roy Cooper on June 25, 2018. The General Assembly found that the preservation and testing of SAECKs is important to public safety. Timely testing is vital to solve cases, punish offenders, bring justice to victims, and prevent future crimes. It is the intent of the General Assembly that every sexual assault evidence collection kit in North Carolina be tested. Sexual assault victims deserve no less. Sections 1 and 2 established a statewide SAECK tracking system (beginning October 1, 2018) to be administered pursuant to protocols developed by the Director of the State Crime Laboratory. The Secretary of Public Safety was required to adopt rules, guidelines, and sanctions for agencies required to participate in the tracking system. Section 3 directed the Secretary of Public Safety to convene a working group to make findings and recommendations to the Secretary and the Director of the State Crime Laboratory regarding the SAECK tracking system, as well as the following:

---

[1] This Report follows SL 2017-57 in using the term "untested" rather than "unsubmitted," although the inventory concerned unsubmitted SAECKs in law enforcement custody, rather than SAECKs which are pending analysis at forensic laboratories. Both terms are important for strategic planning in response to sexual assault, as State and local agencies work toward improving efficiencies throughout the investigative process.

*Develop findings and recommendations, including a strategic plan to (i) establish the order of priority for testing kits; (ii) test all of the kits that can be tested; (iii) direct the preservation of all kits; (iv) suggest sanctions for the destruction or contamination of kits in violation of G.S. 15A268; and (v) develop statewide protocols to test sexual assault evidence collection kits in the future.*

Following the appointment of membership, the Department of Public Safety (DPS) SAECK Working Group met on July 18, August 8, September 26, October 24, and November 8 to fulfill these legislative mandates. This Report sets forth the DPS SAECK Working Group's consensus strategic plan, findings, and recommendations.

# Executive Summary

In accordance with N.C. Sess. Law 2018-70, the Secretary of Public Safety convened a Working Group to make recommendations regarding the testing priority of previously untested sexual assault evidence collection kits (hereinafter "SAECKs") currently in law enforcement custody. The Working Group was also charged with developing a strategic statewide plan for preserving and testing previously untested SAECKs and future SAECKs, along with making recommendations to the Secretary of Public Safety and the State Crime Laboratory with respect to SAECK tracking rules and protocols. A summary of the Working Group's strategic plan (with findings and recommendations) is set forth below, with further discussion of each point within Parts 1-3 of this Report.

**Summary of SAECK Testing Recommendations (Part 1)**

1. Require forensic testing of all future SAECKs connected with sexual assaults reported to law enforcement:
    a. Specify timelines for submission of future SAECKs for testing;
    b. The General Assembly must provide the necessary funding for new DNA analyst positions at the State Crime Laboratory in anticipation of increased submissions; and
    c. Monitor other laboratory funding needs (*e.g.*, testing supplies) as they may arise due to increased submissions.
2. Forensic testing of previously untested SAECKs connected with sexual assaults reported to law enforcement, with a phased approach of review and prioritization so outsourced testing commences as soon as possible and proceeds until all inventoried SAECKs have been tested:
    a. Delegate "order of priority" determinations for previously untested SAECKs to local jurisdiction multi-disciplinary teams, so testing decisions for previously untested SAECKs are made in accordance with Working Group recommended processes and national best practice models;
    b. Request an increase in recurring appropriations of $3 million from the General Assembly for outsourced testing by vendor laboratories to meet funding needs for testing all previously untested SAECKs; and

3. Promotion of statewide support for NCDOJ's federal grant-funded SAECK testing and sexual assault response initiatives:
   a. Follow-up inventory of previously untested SAECKs, in conjunction with efforts to enter these SAECKs into the tracking system;
   b. Identification of "partially-tested" SAECKs and testing all such SAECKs which may yield CODIS[2]-eligible DNA profiles;
   c. Development and incorporation of a plan to support law enforcement and prosecutor training in trauma-informed, victim-centered investigative practices, including victim notification and engagement to improve investigation and prosecution outcomes;
   d. Promotion of victim services and publication of information related to SAECK tracking and testing initiatives; and
   e. Ensuring regular and timely CODIS hit follow-up by law enforcement by providing necessary training and resources.

**Summary of SAECK Tracking Recommendations (Part 2)**

Working Group recommendations to the Secretary and to the State Crime Laboratory regarding SAECK tracking were substantially implemented prior to the October 1, 2018 start date for the statewide tracking system. Draft rules have been approved by the Working Group to proceed through the rule-making process.

**Summary of SAECK Preservation Recommendations (Part 3)**

North Carolina law (G.S. 15A-268) currently satisfies the objectives of directing preservation of SAECKs and specifying criminal offenses for intentional violations. However, the Working Group reached consensus on additional related recommendations, such as the need to ensure sufficient law enforcement training on best practices for SAECK storage and preservation.

---

[2] CODIS is the acronym for the Combined DNA Index System, the FBI's program of support for criminal justice DNA databases nationwide.

Case 1:22-cv-00568-CCE-JLW   Document 18-4   Filed 08/01/22   Page 8 of 26

# Strategic Plan, Findings, and Recommendations
# Part 1: SAECK Testing

The core SAECK testing questions presented to the Working Group pertained to: (a) testing new SAECKs going forward and (b) testing previously untested SAECKs. These two core questions implicate a wide array of concerns to be addressed in an overall strategic plan.

## Protocols for Future SAECK Testing

> *Recommendation #1: Require forensic testing of future SAECKs connected with sexual assaults reported to law enforcement.*

With respect to *future* sexual assault forensic medical examinations, all SAECKs used in connection with sexual assaults reported to law enforcement should be submitted immediately for forensic testing.

In order to facilitate the policy objective of testing all SAECKs in cases reported to law enforcement, the Working Group further finds and recommends the following target guidelines:

> (1) An investigating law enforcement agency should retrieve each SAECK from the medical service provider no later than 7 days from the date of the medical examination;
>
> (2) The investigating law enforcement agency should submit each SAECK to a forensic laboratory no later than 45 days after taking custody of it; and,
>
> (3) A forensic laboratory should complete forensic testing as soon as practicable after receipt of a SAECK, subject to available resources.

SAECKs used in connection with non-reported sexual assaults should be securely stored and preserved for potential forensic testing at a future date in the event the victim later elects to report to law enforcement.[3] SAECKs for non-reported sexual

---

[3] The United States Department of Justice (USDOJ) Office on Violence Against Women also cautions against forensic testing where the victim has not initially consented to participate in the criminal justice system, both for safety and privacy reasons.

assaults should be stored by DPS at Law Enforcement Support Services, rather than being stored by law enforcement.

Greater resources—such as additional forensic scientist positions appropriated by the General Assembly—will be required for public laboratories to handle the increased submission levels expected to result from implementation of the Working Group's testing recommendations. Forensic laboratories should closely monitor and report on submission trends to identify other funding needs as they emerge. If not already in place, forensic laboratories should incorporate the processing efficiency recommendations set forth in the National Institute of Justice's publication *National Best Practices for Sexual Assault Kits: A Multidisciplinary Approach*.[4]

Under certain circumstances, the process for forensic testing in a particular case may be stopped at the request of the local jurisdiction. However, the Working Group recommends that any "stop work" decision should be made only by the prosecution in consultation with the investigating law enforcement agency, or subject to prosecutorial review if the decision is initially made by law enforcement. Factors which may be relevant to a "stop work" are discussed in more detail in the next section with respect to previously untested SAECKs.

**Previously Untested SAECKs[5]**

> ***Recommendation #2: Forensic testing of previously untested SAECKs connected with sexual assaults reported to law enforcement, with a phased approach of review and prioritization so testing commences as soon as possible and proceeds until completion.***

The Working Group recommends that all *previously untested* SAECKs for which there has been a reported sexual assault should be assessed immediately for possible outsourced testing, subject to available funding provided by the General Assembly or other sources.

---

[4] The State Crime Laboratory, for instance, has implemented all six of these efficiencies, including increased automation and "Direct to DNA" processing.
[5] This section pertains more specifically to "unsubmitted" SAECKs in law enforcement custody but again follows the terminology of "untested" from the 2017 inventory provision.

Case 1:22-cv-00568-CCE-JLW   Document 18-4   Filed 08/01/22   Page 10 of 26

Each individual SAECK to be tested represents a real person who has come forward to report a sexual assault and who has also undergone a long and invasive medical examination process. Those persons deserve to have the evidence analyzed. The Working Group recognizes the challenge of testing an influx of thousands of SAECKs will require testing to be done in phases.

Phased testing will necessarily present complex decisions which cannot all be directed from the statewide level. Therefore, it is recommended that phased testing decisions be made at the local jurisdictional level, taking into consideration the process recommendations in the next section of this Report. As the administrator of outsourced testing initiatives at the statewide level, the State Crime Laboratory should ensure that phased funding is equitably distributed based on testing needs so each jurisdiction is able to work toward submitting and testing all SAECKs for their reported cases.

**Process Recommendations for Phased SAECK Submission and Testing**

First and foremost, the Working Group recommends that each respective jurisdiction utilize a multi-disciplinary team (MDT) approach to decision-making for the phased submission and testing of previously untested SAECKs, as well as to discuss any potential "stop works" for future SAECKs. At minimum, the MDT should include representatives from prosecution, law enforcement, sexual assault nurse examiners (SANEs), victim advocacy groups, survivors of sexual assault, and representatives from a forensic laboratory (or at least a member who can serve as a liaison with forensic testing experts).

Local MDTs should implement what has been called a "modified fork-lift approach" in identifying SAECKs for testing. This approach involves an initial selection of a random number of SAECKs—for instance, selecting 50 out of 100 previously untested SAECKs—from which to conduct the first "cycle" of standardized case review on the randomly selected SAECKs. For agencies with fewer than 50 previously untested SAECKs, only one cycle should be necessary.

7

To determine each sexual assault evidence collection kit's submission priority, the standardized case review of randomly selected SAECKs should take into consideration factors such as the following:[6]

> ➢ Investigative and evidentiary value for the individual case;
> ➢ Potential value for admission as Rule 404(b) evidence to help prove prior bad acts of the same defendant across cases[7];
> ➢ CODIS potential to link profiles and identify possible serial offenders[8]
> ➢ Age and health of victim;
> ➢ Potential for victim participation in the investigation and prosecution[9]; and
> ➢ Potential for exculpatory value for a criminal suspect, defendant, or convicted person.

After a first group (cycle) of SAECK submissions is determined, the process should be repeated (multiple cycles) until all SAECKs have been subject to the MDT's standardized case review and prepared for submission. SAECKs not included in the initial submission would continue to be stored until all cycles of the case review process are complete.[10]

The goal after all cycles are completed is to have *all* SAECKs submitted for testing. Only those SAECKs falling into one of the following three categories should be withheld from testing:

(1) "Unreported": SAECKs not connected with a reported sexual assault— *i.e.*, when the offense has not been reported to law enforcement (for a victim who seeks medical treatment but does not wish to participate in the criminal justice process);[11]

---

[6] These recommendations do not override any other obligations imposed by law, including any constitutional provision or statute.

[7] SAECKs not previously tested because an assault was "he said, she said" should be submitted for testing because this may lead to connections across multiple uncharged cases.

[8] Note that serial or repeat offenders are just as often identified in "non-stranger" cases as they are in "stranger" cases.

[9] This is only one factor in prioritization. Victim participation must not be determinative of *whether* to test a SAECK, due to the importance of developing CODIS-eligible DNA profiles.

[10] Storage of SAECKs is also subject to the biological evidence preservation requirements imposed by law, including but not limited to the requirements under G. S. § 15A-268.

[11] Agencies should consider longer term storage of all such "unreported" SAECKs at the DPS Law Enforcement Support Services storage facility.

(2) "Unfounded": SAECKs which, *after a complete MDT review and a comprehensive and documented law enforcement case review*, have been confirmed to be connected with unfounded allegations;[12] and,

(3) "Post-conviction": SAECKs for which a criminal prosecution has resulted in conviction *and* where (a) the convicted person does not seek DNA testing and (b) the convicted person's DNA profile is confirmed to be in CODIS already. MDTs should engage with the North Carolina Innocence Inquiry Commission to assist with SAECK testing decisions related to post-conviction cases.

Nearly half of the 15,160 SAECKs identified by the 2017 inventory did not fall into any of the four listed inventory categories. This means MDTs will surely encounter other stated reasons for the initial decision not to submit SAECKs for testing including outcomes tied to victim participation, prosecution-related decisions, or other reasons. Although such reasons could impact criminal charges in a single case, they should not preclude testing SAECKs for the purpose of developing CODIS-eligible DNA profiles which may link multiple cases together. Because many perpetrators of sexual violence tend to re-offend, CODIS is a critical investigative tool for identifying and apprehending repeat offenders, even when one victim may not wish to prosecute.

The Working Group's overall recommendation to test all previously untested SAECKs in reported cases reflects lessons learned from other jurisdictions where such testing resulted in the development of critical investigative leads or helped in apprehending a repeat offender by linking multiple cases together. MDT decision-making must be victim-centered and trauma-informed, in order to avoid making victim credibility determinations based on mistaken beliefs or presumptions about victim credibility in sexual assault claims.

The Conference of District Attorneys, NCDOJ, and the State Crime Laboratory should seek to leverage relevant grant funding to provide technical assistance and training for local jurisdiction MDTs. The Working Group recommends that **no later than May 1, 2019**, each local jurisdiction be ready to identify and submit the first group (cycle) of previously untested SAECKs for outsourced testing. This

---

[12] State and federal laws and regulations preclude CODIS upload of DNA profiles from SAECKs when not connected to a criminal offense.

Case 1:22-cv-00568-CCE-JLW   Document 18-4   Filed 08/01/22   Page 13 of 26

timeframe allows each jurisdiction several months to determine a phased testing plan, while also ensuring that SAECKs are ready for submission in order to commit outsourcing funding as it becomes available. Many jurisdictions already have sexual assault response teams (SARTs) which can serve the function of the MDT if the SART utilizes appropriate MDT training materials, such as those available through the Training and Technical Assistance program under the National Sexual Assault Kit Initiative (https://www.sakitta.org/).

Time is of the essence in testing previously untested SAECKs, because each investigative and CODIS hit lead has the potential to remove a dangerous offender from the streets.

The foregoing recommendations do not preclude local jurisdictions from using other funding sources besides (or in addition to) those made available through the General Assembly's State Crime Laboratory appropriations and grant funding.

## Local Agency Cooperation with NCDOJ Sexual Assault Kit Initiatives[13]

> *Recommendation #3: Promotion of statewide support for NCDOJ's federal grant-funded SAECK testing and sexual assault response initiatives.*

Following the recent award of a $2 million federal Sexual Assault Kit Initiative (SAKI) grant to NCDOJ, a number of additional funded initiatives will be advanced at the statewide level during the three-year grant period (FY19 to FY21) and beyond. The Working Group finds such initiatives are essential to strategic planning for SAECK tracking and testing, and therefore recommends local agencies partner with and support NCDOJ's efforts under SAKI.

Local agencies also stand to benefit from the statewide SAKI grant, both in terms of expanded funding for SAECK testing, and improved resources and training for sexual assault investigations, prosecutions, and support for victims of sexual assault. These benefits are expected to accrue to victims and the general public by leading to the identification of more sexual assault perpetrators and bringing them to justice.

---

[13] SAKI: National Sexual Assault Kit Initiative FY18 Competitive Grant, awarded by the USDOJ Bureau of Justice Assistance effective October 1, 2018.

Case 1:22-cv-00568-CCE-JLW   Document 18-4   Filed 08/01/22   Page 14 of 26

## 1. Increased CODIS Resources and Follow-up; ViCAP

CODIS hit follow-up is essential for sexual assault investigations and other crimes involving DNA evidence. A current State statute (G.S. 15A-266.5) seeks information related to arrests and convictions resulting from CODIS hits. However, there is currently no mechanism to track this information, and there is no requirement that law enforcement agencies take affirmative steps to resolve cases (for sexual assaults or otherwise) when a CODIS hit is reported.

As North Carolina moves toward testing all reported-case SAECKs and progresses with testing several thousand previously untested SAECKs, the Working Group recommends State and local agencies work together to ensure effective CODIS hit follow-up to support investigations. Local agencies that do not have CODIS hit follow-up plans in place should create and implement such plans, including designation of a single point of contact for communication with CODIS administrators at the State Crime Laboratory and/or the Charlotte-Mecklenburg Police Department. Relevant training is available at https://www.sakitta.org/.

CODIS plans must also address notification to criminal suspects, defendants, or convicted persons whenever a CODIS hit is exculpatory in nature. For convicted persons in post-conviction settings, this may be accomplished by notifying Indigent Defense Services.

Investigating agencies should also utilize the FBI's Violent Criminal Apprehension Program (ViCAP) even if a SAECK test does not result in a suspect match or CODIS-eligible profile. ViCAP maintains a nationwide data information center that collects, collates, and analyzes crimes of violence (including sexual assaults). ViCAP analysts examine crime data and patterns to identify potential similarities among crimes, create investigative matrices, develop time-lines, and identify homicide and sexual assault trends and patterns. Successful ViCAP initiatives will likely require a future commitment of additional State and local resources. Relevant ViCAP training is also available at https://www.sakitta.org/.

## 2. Victim Notification and Engagement

Lessons learned in other jurisdictions demonstrate when SAECKs are tested, in some cases many years after the initial forensic medical examination, the relevant

notifications to victims (related to investigation and prosecution) can cause further emotional trauma if not handled properly. A victim-centered, trauma-informed engagement approach can provide new opportunities to build more positive relationships with victims and re-establish their trust in the criminal justice system.

Therefore, local jurisdictions should be equipped with appropriate victim notification and engagement strategies and must be willing to direct the necessary resources to carry out such strategies effectively.

The Working Group recommends local jurisdictions leverage MDTs and ensure available training (Survivor Sensitivity Training and Awareness) and policy guidance is in place to address victim notifications in connection with previously untested SAECKs. Victim advocates should be heavily involved in determining who will directly notify victims and how the process of notification and engagement will be carried out. Agencies working with marginalized and underserved communities should also be involved in developing these plans.

Law enforcement agencies should note, particularly, that the first notification and engagement will likely occur when victims receive their tracking numbers for previously untested SAECKs (pursuant to G.S. 114-65(d)), and these encounters will create *immediate* potential for re-traumatization. Therefore, the Working Group recommends that the "reasonable measures" under G.S. 114-65(d) be treated by law enforcement agencies as not only measures taken to locate victims, but also measures taken to ensure the notification and (re-)engagement process promotes positive victim relationships and does not re-traumatize victims.

NCDOJ (through the Justice Academy, the State Crime Laboratory, and the Public Protection Section of the Attorney General's Office in partnership with the NC Coalition Against Sexual Assault) will seek to leverage available resources, including SAKI funding and the SAKI Training and Technical Assistance program, to offer training and technical assistance in victim notification and engagement for local jurisdictions. The Conference of District Attorneys should also support NCDOJ in these efforts when resources permit.

12

### 3. Follow-up Inventory of Previously Untested SAECKs

In order to meet SAKI inventory requirements for previously untested SAECKs, local jurisdictions should permit NCDOJ and State Crime Laboratory personnel to access evidence rooms for the purpose of further inventory or, in the alternative, provide all data/information requested by NCDOJ. Follow-up inventory will be carried out in conjunction with efforts to enter previously untested SAECKs into the statewide tracking system as required under G.S. § 114-65, which will help ease the burden on local agencies by not duplicating efforts.

Information relevant to the SAKI inventory of untested SAECKs will include at least the following:
  ➢ The overall range of dates for which SAECKs have been in the site's possession;
  ➢ The age of the victim;
  ➢ The date of the offense;
  ➢ The date of SAECK collection;
  ➢ The law enforcement incident number;
  ➢ SAECK barcode tracking number;
  ➢ Note if the offense is a misdemeanor (Y/N); and
  ➢ Location where SAECKs are stored at the agency (listing multiple locations, if applicable).

### 4. Partially-Tested SAECKs

The Working Group recommends that SAKI requirements related to "partially-tested" SAECKs are also incorporated into the State's strategic plan. The State Crime Laboratory will leverage its older case records to identify partially-tested SAECKs in each of the following categories involving older DNA testing methods: (1) where forensic testing was terminated following negative serology screening results; (2) where the type of DNA profile generated pre-dated autosomal STR methods and is therefore incompatible with the types of profiles now used for the CODIS database; or, (3) where autosomal STR testing using older technology did not result in a CODIS-eligible profile, but newer and improved testing technologies may be expected to improve this testing outcome.

13

These types of partially-tested SAECKs—to the extent they have not already been re-tested through past initiatives—present potential opportunities to develop CODIS-eligible DNA profiles. Law enforcement agencies should work with the State Crime Laboratory to locate and inventory partially-tested SAECKs and to help identify those which are appropriate for follow-up DNA testing using newer CODIS-compatible methods.

# Strategic Plan, Findings, and Recommendations
# Part 2: SAECK Tracking

The State Crime Laboratory presented a test version of its SAECK Tracking and Information Management System ("STIMS") software at the initial meeting of the Working Group on July 18, 2018. The Working Group also had access to the final version of the tracking website (http://www.SexualAssaultKitTracking.ncdoj.gov), the STIMS training videos, FAQs, user guidelines, and a draft version of DPS proposed administrative rules. The Working Group's feedback was substantially incorporated into the System, and the Working Group determined STIMS fully satisfies the legislative intent of G.S. 114-65(a1)-(d) and will allow appropriate data to be compiled and reported annually on October 1 in compliance with G.S. 114-65(e).

Specifically, STIMS will ensure victims of sexual assault are able to track the location and the forensic testing status of their SAECKs, and in a way which also safeguards victim information. Substantial efforts are already underway to train and educate medical service providers, law enforcement agencies, and forensic laboratories on the use of the system for new SAECKs, as well as to incorporate previously untested SAECKs into the system through the distribution of bar codes for these SAECKs. While it is to be expected that implementation of a new system of this scope and magnitude will present significant administrative challenges, the State Crime Laboratory has taken several proactive measures in anticipation of such challenges.

It is further anticipated the State Crime Laboratory may need to deploy personnel on location to various medical service providers and law enforcement agencies to provide technical support for STIMS initiatives, especially with respect to the approximately 15,160 untested SAECKs identified in the 2017 inventory report. Funding for these efforts may be partially supported through the $2 million federal SAKI grant.

Additional costs may also be incurred as a result of necessary updates or patches to the initial STIMS software. To the extent the State Crime Laboratory cannot cover such costs through grant funding, further appropriations may be necessary.

**Additional Tracking System Features**

Consistent with minimum tracking system requirements tied to SAKI funding, it was the consensus recommendation that the STIMS system incorporate the following (internal) data-tracking:

(1) Results of DNA testing:
   ➢ DNA profile obtained? (yes/no)
   ➢ CODIS eligible? (yes/no)
   ➢ Date of CODIS upload
   ➢ CODIS hit returned, date and type of hit (offender, other case)
(2) Current investigative status

These entries were enabled in the first version effective October 1, 2018.

Also pursuant to Working Group recommendations, a future updated version of STIMS will incorporate a search function for district attorneys to monitor SAECK location and testing status within their respective districts.

# Strategic Plan, Findings, and Recommendations
# Part 3: SAECK Preservation

During its September 26, 2018 meeting, the Working Group unanimously agreed that G.S. 15A-268 sufficiently directs the preservation of SAECKs, and imposes appropriate and significant sanctions (i.e., felony criminal offenses) against anyone who "knowingly and intentionally destroys, alters, conceals, or tampers with" SAECKs required to be preserved. The statute also requires the State Crime Laboratory to promulgate guidelines for proper retention and preservation of biological evidence.

Nevertheless, the Working Group believes greater statewide efforts toward preservation of SAECKs are warranted, and recommends all law enforcement agencies take immediate steps to ensure SAECKs in their custody are not only retained, but preserved in a manner consistent with best practices. Agencies must store SAECKs in a climate-controlled environment (*not* refrigerated) and in a manner which safeguards against potential contamination, degradation, or other damage.[14]

The Working Group further recommends all agencies covered by G.S. 15A-268 be provided with continual training and technical assistance in preserving biological evidence, especially with respect to accountability and proper storage of SAECKs. Additionally, the State should leverage its resources to provide additional storage space as needed for agencies that do not have adequate storage capacity to comply with best practices.

---

[14] Law enforcement agencies currently unable to comply with State Crime Laboratory guidelines for proper storage of SAECKs should consider formally documenting storage conditions for each affected SAECK and seek available alternative storage solutions immediately.

# Conclusion

The Working Group's strategic plan, findings, and recommendations should not be viewed as the resolution of an issue, but rather (in conjunction with N.C. Sess. Law 2018-70) as the beginning of a statewide initiative in support of local jurisdiction responses to sexual assault. Tracking and testing SAECKs are each major components of an effective response to sexual assault and both initiatives warrant increased State attention and resources. However, these components are only a part of the overall effort. To enhance public safety, local jurisdictions must be provided with adequate guidance, support, and training to adopt and implement a long-term, holistic approach to sexual assault response which goes well beyond criminal investigations and prosecutions. Potential legislation to enact the recommendations found in this report is attached as Appendix 1.

AN ACT TO REQUIRE TESTING OF SEXUAL ASSAULT EVIDENCE COLLECTION KITS AND PREVIOUSLY UNTESTED SEXUAL ASSAULT EVIDENCE COLLECTION KITS.

The General Assembly of North Carolina enacts:

## PART I. TITLE

**SECTION 1.** This act shall be known and may be cited as "The Standing Up for Rape Victims (SURVIVOR) Act of 2018."

## PART II. SEXUAL ASSAULT EVIDENCE COLLECTION KITS COMPLETED ON OR AFTER JULY 1, 2019.

**SECTION 2.** Article 9 of Chapter 114 of the General Statutes is amended by adding a new section to read:

"**§ 114-66. Statewide sexual assault evidence collection kit testing protocol.**

(a) Legislative Intent. – The General Assembly finds that deoxyribonucleic acid (DNA) evidence is a powerful law enforcement tool that can identify unknown suspects, create case linkages, connect crimes to known perpetrators, and exonerate the innocent. Timely testing is vital to solve cases, punish offenders, bring justice to victims, and prevent future crimes. It is the intent of the General Assembly that every sexual assault evidence collection kit reported to law enforcement in North Carolina be tested and eliminate the inventory of untested sexual assault evidence collection kits located statewide. The purpose of this Act is to address the manner in which sexual assault evidence collection kits are processed and the protocol for testing the statewide inventory of untested sexual assault evidence collection kits identified pursuant to the findings of the statewide audit completed pursuant to Section 17.7 of S.L. 2017-57.

(b) The following definitions apply in this Part.

(1) CODIS. – Defined under G.S. 15A-266.2(1a).

(2) State DNA Database. – Defined under G.S. 15A-266.2(8).

(3) Reported Sexual Assault Evidence Collection kit. – A reported sexual assault evidence collection kit is a sexual assault evidence collection kit collected from a person who consented to the collection of the sexual assault evidence collection kit and has consented to participate in the criminal justice process by reporting the crime to law enforcement.

(4) Unfounded Sexual Assault Evidence Collection kit. – A reported sexual assault evidence collection kit whereupon completion of the investigation it was concluded based on information and evidence that a crime clearly did not occur.

(5) Unreported Sexual Assault Evidence Collection kit. – An unreported sexual assault evidence collection kit is a sexual assault evidence collection kit collected from a person who consented to the collection of the sexual assault evidence collection kit but has not consented to participate in the criminal justice process.

(c) Mandatory submission and testing requirements for sexual assault evidence collection kits completed after the date in which this act becomes law. Any agency, program, center, or other entity that collects a sexual assault evidence collection kit shall preserve the kit according to

19

guidelines set forth in G.S. 15A-268 and notify the appropriate law enforcement agency as soon as practicable after the kit's collection; provided the notification shall be no later than twenty-four hours after the collection occurred.

    (d)    A notified law enforcement agency shall:

        (1) Take possession of a sexual assault evidence collection kit from the agency, program, center, or other entity that collected the kit within seven (7) days of receiving notification and it should be kept and preserved according to the guidelines set forth in G.S. 15A-268.

        (2) Submit a reported sexual assault evidence collection kit to the State Crime Laboratory or a State Crime Laboratory approved laboratory not more than forty-five (45) days after taking custody of the sexual assault evidence collection kit.

        (3) Submit an unreported sexual assault evidence collection kit to the Department of Public Safety for storage pursuant to G.S. 143 B-601(13) not more than forty-five (45) days after taking custody of the sexual assault evidence collection kit.

    (e)    The State Crime Laboratory or a State Crime Laboratory approved laboratory shall pursue DNA analysis of the sexual assault evidence collection kit that was accepted from a law enforcement agency to develop DNA profiles that are eligible for entry into CODIS pursuant to G.S. 15A-266.5 and G.S. 15A-266.7 and the State DNA Database. The state CODIS System Administrator or their designee shall enter a DNA profile into the CODIS database pursuant to G.S. 15A-266.8; and the State DNA Database, provided that the testing of a sexual assault evidence collection kit resulted in an eligible DNA profile."

## PART III. SEXUAL ASSAULT EVIDENCE COLLECTION KITS COLLECTED BEFORE JANUARY 1, 2018.

    **SECTION 3.1.  Article 9 of Chapter 114 of the General Statutes is amended by adding a new section to read:**

**"§ 114-67.  Statewide sexual assault evidence collection kit testing protocol for untested sexual assault evidence collection kits completed before January 1, 2018.**

    (a)    The definitions of G.S. 114-66, as amended by Part II of this act, apply in this Part.

    (b)    Mandatory submission and testing requirements for sexual assault evidence collection kits completed before January 1, 2018. Any law enforcement agency that possesses a sexual assault evidence collection kit completed before January 1, 2018, shall do the following as soon as practicable, no later than three months after the date in which this act becomes law.

    (c)    Establish a review team that may consist of prosecutors, law enforcement, sexual assault nurse examiners, victim advocacy groups, survivors of sexual assault, and representatives from a forensic laboratory.

    (d)    The review team will survey their entire untested sexual assault evidence collection kit inventory and conduct a case review to determine each sexual assault evidence collection kit's submission priority.

    (e)    The review of each untested sexual assault evidence collection kit should take into consideration each of the following factors in determining each sexual assault evidence collection kit's submission priority:

        (1)    Investigative and evidentiary value for the individual case.

        (2)    CODIS potential to link profiles and identify possible serial offenders.

        (3)    Potential for victim participation in the investigation and prosecution.

        (4)    Potential value for admission as Rule 404(b) evidence.

(5)     Age and health of victim.

(6)     Potential for exculpatory value for a convicted person.

(7)     Or any other factor the review team deems to be relevant.

(f)     Only the following untested sexual assault evidence collection kits should be withheld from submission:

(1)  Unreported sexual assault evidence collection kits. Unreported sexual assault evidence collection kits shall be sent to the Department of Public of Safety for storage pursuant to G.S. 143B-601(13).

(2)  Sexual assault evidence collection kits which after a complete review by the review team and a comprehensive law enforcement case review, have been confirmed to be an unfounded sexual assault evidence collection kit. The law enforcement agency shall track within the agency the number of sexual assault evidence collection kits which are concluded to be unfounded along with a brief summary indicating the information and evidence supporting the determination of an unfounded sexual assault evidence collection kit. Should the law enforcement agency receive any information or evidence that creates investigative or evidentiary value for testing the sexual assault evidence collection kit, the law enforcement agency shall send the sexual assault evidence collection kit to the State Crime Laboratory or a State Crime Laboratory approved laboratory as soon as practicable.

(3)  Sexual assault evidence collection kits for which a criminal prosecution has resulted in conviction where the convicted person does not seek DNA testing and the convicted person's DNA profile is already in CODIS.

(g)     Upon determination that a sexual assault evidence collection kit is of priority status, a law enforcement agency shall notify the State Crime Laboratory or a State Crime Laboratory approved laboratory and request testing of the sexual assault evidence collection kit. The law enforcement agency shall continue this process until all untested sexual assault evidence collection kits not subject to subsection (f) have been submitted for testing.

(h)     The State Crime Laboratory or a State Crime Laboratory approved laboratory shall notify a law enforcement agency that has submitted a written request for testing, as soon as practicable after receiving the request, of the request's approval and provide shipment instructions for the sexual assault evidence collection kit to either the State Crime Laboratory or a State Crime Laboratory approved laboratory for testing.

(i)     Sexual Assault Response and Training. The North Carolina Department of Justice, North Carolina Coalition Against Sexual Assault, North Carolina Victims Assistance Network, and the Conference of District Attorneys shall develop and provide response and training programs to law enforcement and their sexual assault evidence collection kit review teams regarding sexual assault investigations, including victim interactions and kit collection, storage, tracking, and testing.

(j)     Lack of compliance with any parts of the time requirements of this section shall not:

(1) Constitute grounds upon which any person may challenge in any hearing, trial, or any other court proceeding the validity of DNA evidence in any criminal or civil proceeding;

(2) Justify exclusion of evidence generated from a sexual assault evidence collection kit; or

21

(3) Provide a person who is accused or convicted of committing a crime against a victim a basis to request that the person's case be dismissed, conviction be set aside, provide a cause of action, or provide a civil claim.

**SECTION 3.2**. G.S. 15A-266.8 reads as rewritten:

(d)      CODIS hit follow-up. Pursuant to the reporting requirement established by G.S. 15A-266.5(c), any law enforcement agency that receives an actionable CODIS hit on a submitted DNA sample must provide electronic notice to the State Crime Lab within fifteen days (15) of an arrest in connection with the CODIS hit and within fifteen days (15) of a conviction in connection with the CODIS hit."

## PART IV.  SEXUAL ASSAULT EVIDENCE COLLECTION KITS COLLECTED AFTER JANUARY 1, 2018 AND BEFORE THIS ACT BECOMES LAW.

**SECTION 4.**  Article 9 of Chapter 114 of the General Statutes is amended by a new section to read:

**"§ 114-68.  Sexual Assault Evidence Collection Kits not subject to G.S. 114-66 or G.S. 114-67 shall be submitted to the State Crime Laboratory or a State Crime Laboratory approved laboratory as soon as practicable."**

## PART V.  APPROPRIATIONS

**SECTION 5.1.** There is appropriated form the General Fund to the Department of Justice, the sum of three million dollars ($3,000,000) in recurring funds for the 2019-2020 fiscal year. These funds shall not be used for any purpose other than to assist with the testing of untested sexual assault evidence collection kits as prescribed under this Act.  These funds shall not supplant existing funds provided for DNA testing to the North Carolina State Crime Laboratory.

**SECTION 5.2.** There is appropriated from the General Fund to the Department of Justice the sum of eight hundred thousand dollars ($700,000) in recurring funds for the 2019-2020 fiscal year. The Department of Justice shall use these funds to create six (6) full time equivalent forensic scientist positions to enhance the State Crime Laboratory's ability to test a high submission of sexual assault evidence collections kits and reduce laboratory turnaround time.

**SECTION 5.3.**  This part becomes effective July 1, 2019.

## PART VI.  EFFECTIVE DATE

**SECTION 6.**  Except as otherwise provided in this act, this act is effective when it becomes law.

22