IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Case No. 1:22-CV-568

| | |
|---|---|
| JULIETTE GRIMMETT, RALSTON LAPP GUINN MEDIA GROUP, and the JOSH STEIN FOR ATTORNEY GENERAL CAMPAIGN,<br><br>Plaintiffs,<br><br>v.<br><br>DAMON CIRCOSTA, in his official capacity as Chair of the North Carolina State Board of Elections, STELLA ANDERSON, in her official capacity as Secretary of the North Carolina State Board of Elections, JEFF CARMON III, in his official capacity as Member of the North Carolina State Board of Elections STACY EGGERS IV, in his official capacity as Member of the North Carolina State Board of Elections, TOMMY TUCKER, in his official capacity as Member of the North Carolina State Board of Elections, and N. LORRIN FREEMAN in her official capacity as District Attorney for the 10th Prosecutorial District of the State of North Carolina,<br><br>Defendants. | **SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

## INTRODUCTION

Plaintiffs Juliette Grimmett, Ralston Lapp Guinn Media Group ("Ralston Lapp"), and the Josh Stein for Attorney General Campaign ("Stein Campaign," all three collectively referred to as "Plaintiffs"), by their undersigned counsel, respectfully submit

this Supplemental Memorandum of Law in Support of their Motion for Preliminary Injunction.

Plaintiffs contend that Defendant[1] cannot "show cause… why this restraining order should not be continued as a preliminary injunction to the final adjudication of this cause" (Doc. 16 at ¶ 4), because N.C. Gen. Stat. § 163-274(a)(9) – the Statute sought to be enforced by Defendant – abridges First Amendment freedom of speech by seeking to regulate core political speech in a manner not tailored to achieve a compelling state interest.

## QUESTION PRESENTED

Should Defendant continue to be enjoined from enforcement of the patently unconstitutional Statute by the issuance of a preliminary injunction?

## FURTHER ARGUMENT

### DEFENDANT SHOULD BE PRELIMINARILY ENJOINED FROM ENFORCING N.C. GEN. STAT. § 163-274(a)(9)

**I.  The Strict Scrutiny Test – A Burden Defendant Cannot Bear – Should Apply to the Challenged Statute.**

Each of the four recent cases that have found campaign speech-restriction laws to be unconstitutional have applied the strict scrutiny test. *See*, *e.g.*, *Susan B. Anthony List v. Driehaus,* 814 F.3d 466, 472-73 (6th Cir. 2016) ("In this instance, strict scrutiny applies, whether we apply old First Amendment law or more recent First Amendment law" because

---

[1] On July 29, 2022, Plaintiffs voluntarily dismissed the State Board of Elections Defendants from this action based on their representation in court on July 25, 2022 that their investigation relating to this matter is complete and that they intend to take no further action relating to their investigation. The sole remaining Defendant is the Wake County District Attorney.

the Ohio laws were "content-based restrictions focused on a specific subject matter and are subject to strict scrutiny"); *Commonwealth v. Lucas*, 472 Mass. 387, 397 (2015) (finding "the applicable standard for content-based restrictions on political speech is clearly strict scrutiny" under Massachusetts Declaration of Rights); *281 Care Committee v. Arneson*, 766 F.3d 774, 784 (8th Cir. 2014) ("because the speech at issue occupies the core of the protection afforded by the First Amendment, we apply strict scrutiny to legislation attempting to regulate it."). That also includes the pre-*Alvarez*[2] decision, *Rickert v. State*, 161 Wash. 2d 843, 848 (2007) ("any statute that purports to regulate such [core political] speech based on its content is subject to strict scrutiny.").

In two of those cases, *281 Care Committee* and *Lucas*, the courts explicitly rejected the contention put forward by Defendant here, namely that the concurring opinion of Justice Breyer in *Alvarez* should be followed rather than its plurality opinion. In *281 Care Committee*, the court based its rejection of that argument on the fact that "although *Alvarez* dealt with a regulation proscribing false speech, it did not deal with legislation regulating false *political* speech." 766 F.3d at 783 (emphasis in original). In the words of that court:

> This distinction makes all the difference and is entirely the reason why *Alvarez* is not the ground upon which we tread. Justice Breyer in his concurring opinion in *Alvarez* recognized the significant difference between the false speech regulated by the Stolen Valor Act and other areas of false speech, including *false political speech*, acknowledging that strict scrutiny is often the test to apply, and noting that *almost no amount of fine tailoring could achieve a similar government interest in a political context.*

---

[2] *United States v. Alvarez*, 567 U.S. 769 (2012).

3

Case 1:22-cv-00568-CCE-JLW Document 19 Filed 08/01/22 Page 3 of 20

*Id.* at 783-84 (emphases added). The *281 Care Committee* court went on to quote from Justice Breyer's *Alvarez* concurrence in which he drew the distinction between the more generic false statement context of *Alvarez* and the political speech context:

> I recognize that in some contexts, particularly political contexts, such a narrowing will not always be easy to achieve. In the political arena a false statement is more likely to make a behavioral difference (say, by leading the listeners to vote for the speaker) but at the same time criminal prosecution is particularly dangerous (say, by radically changing a potential election result) and consequently can more easily result in censorship of speakers and their ideas.

*Id.* at 784 (quoting *Alvarez*, 567 U.S. at 738 (Breyer, J., concurring)). Finally, the court cited the Supreme Court's "pronouncements in the myriad other cases discussing the regulation of political speech" which dictated strict scrutiny as the appropriate level for the analysis of the campaign speech restriction. *Id.* (citing *McCutcheon v. FEC,* 572 U.S. 185, 199 (2014); *Citizens United v. FEC,* 558 U.S. 310, 340 (2010); *Republican Party of Minn. v. White,* 536 U.S. 765, 774 (2002); *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 347 (1995); *Mills v. Ala.,* 384 U.S. 214, 218–19 (1966)).[3]

In addition to that substantial pre-*Alvarez* Supreme Court jurisprudence identifying strict scrutiny as the appropriate standard, virtually all lower courts have recognized that *Alvarez* mandates strict scrutiny, especially in the arena of political speech. *See, e.g.*, *Am. Freedom Def. Initiative v. Se. Pa. Transp. Auth.*, No. 14-5335, 2014 WL 6676517, at *4

---

[3] In *Lucas*, the court, after also recognizing that the *Alvarez* concurrence was based on a reading that the speech at issue did not fall into the category of political speech, stated that "[i]n light of this reasoning, we find it doubtful that the concurring opinion of two justices in *Alvarez* abrogated the well-established line of First Amendment precedent holding that content-based restrictions of political speech must withstand strict scrutiny." 472 Mass. at 396.

4

(E.D. Pa. Nov. 25, 2014) (recognizing that when the claimed falsehoods are "political expression," the speech is "entitled to even greater First Amendment protection than the speech at issue in *Alvarez*"); *In re Jud. Campaign Compl. Against O'Toole*, 141 Ohio St. 3d 355, 363 (2014) (assuming the application of strict scrutiny and observing "*Alvarez* does not consider whether the state can ever have a compelling interest in restricting false speech solely on the basis that it is false so that such prohibition could withstand strict scrutiny."); *O'Neill v. Crawford*, 132 Ohio St. 3d 1472, 1473 (2012) ("The *Alvarez* court ... recognized that not only must the restriction meet the 'compelling interest test,' but the restriction must be 'actually necessary' to achieve its interest."); *State ex rel. Loughry v. Tennant*, 732 S.E.2d 507, 517 (W. Va. 2012) (quoting the plurality opinion from *Alvarez*, for the view that "[W]hen the Government seeks to regulate protected speech, the restriction must be the least restrictive means among available, effective alternatives.").

The legal effect of the application of strict scrutiny to the law challenged here is clear:

- It mandates the presumption of invalidity (*Alvarez*, 567 U.S. at 717);

- It places the burden of demonstrating constitutionality on Defendant (*id.*);

- It requires an articulation of a compelling state interest by the government (*see id.* at 723);

- It requires a showing by the government that its state interest so articulated is served by the restriction (as opposed to serving some other interest) (*id.* at 725);[4] and

---

[4] *Alvarez*, 567 U.S. at 725 (the "First Amendment requires that the Government's chosen restriction on the speech at issue be 'actually necessary' to achieve its interest" (quoting *Brown v. Entertainment Merchants Assn.*, 564 U.S. 786, 799 (2011)).

- It requires a showing that the restriction is narrowly tailored to serve that interest (*id*. at 738 (Breyer, J., concurring).

Here, Defendant – like the governmental defendants in each of the four other campaign-speech restriction cases – cannot satisfy the high level of strict scrutiny.[5] The stark fact is that "[c]ontent-based laws – those that target speech based on its communicative content – are presumptively unconstitutional and may be justified only if the *government proves that they are narrowly tailored to serve compelling state interests.*" *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (emphasis added); *see also Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 665 (2004) ("When plaintiffs challenge a content-based speech restriction, the burden is on the Government to prove that the proposed alternatives will not be as effective as the challenged statute."); *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 817 (2000) ("Content-based regulations are presumptively invalid, and the Government bears the burden to rebut that presumption.") (cleaned up).

This high burden has important implications in the context of a preliminary injunction. On a First Amendment challenge, the State "has the burden of justifying its

---

[5] The Montana case mentioned in passing at the earlier hearing in this case actually supports Plaintiffs' position here. In *Myers v. Thompson*, 192 F. Supp. 3d 1129 (D. Mont. 2016), the court upheld (non-criminal) provisions of Montana's Code of Judicial Conduct and Rules of Professional Conduct of lawyers prohibiting false speech, including in campaign contexts. *Id*. at 1142. In that case, the court articulated a different state interest – the importance of public confidence in the judiciary, *id*. at 1139 – as *distinct from* "the executive or legislature, because the judiciary "has no influence over either the sword or the purse; …neither force nor will but merely judgment." *Id*. (quoting *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 445 (2015) (quoting, in turn, The Federalist No. 78, p. 465 (C. Rossiter ed. 1961) (A. Hamilton) (ellipsis in original)). That rationale cannot support speech restrictions outside the judiciary.

regulation even on a motion to enjoin enforcement" of a state law. *Pacific Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1231 (10th Cir. 2005). Therefore, the State bears the burden of demonstrating that its content-based restriction on speech will "more likely than not" survive strict scrutiny. *See Ashcroft*, 542 U.S. at 666 ("As the Government bears the burden of proof on the ultimate question of [the restriction's] constitutionality, [the moving party] must be deemed to prevail unless the Government has shown that [the moving party's] proposed less restrictive alternatives are less effective than [the restriction]."). And if the State fails to meet this burden, the plaintiff will have shown "a substantial likelihood of prevailing on the merits." *Pacific Frontier*, 414 F.3d at 1231 (affirming district court's conclusion that city failed to meet its burden in justifying its regulation at preliminary injunction state).

## II. The Concept of Criminal Defamation has No Bearing on the Constitutionality of the Statute.

Criminal libel in the 21st century is a largely vestigial area of law. *See, e.g.*, Salil K. Mehra, *Post a Message and Go to Jail: Criminalizing Internet Libel in Japan and the United States*, 78 U. Colo. L. Rev. 767, 768 (2007) (criminal libel is "essentially dead"); Edward L. Carter, *Outlaw Speech on the Internet: Examining the Link Between Unique Characteristics of Online Media and Criminal Libel Prosecutions*, 21 Santa Clara Computer & High Tech. L.J. 289, 292 (2005) (criminal libel is "virtually eradicated"). Nevertheless, such statutes remain on the books in many States, including North Carolina,

7

*see* N.C. Gen. Stat. § 14-47,[6] and courts have been reluctant to categorically rule that criminal libel is no longer a viable concept. *See*, *e.g.*, *Fitts v. Kolb*, 779 F. Supp. 1502, 1515-18 (D.S.C. 1991) (finding South Carolina criminal libel statute unconstitutional and void for vagueness, but declining to "accept…the argument that all criminal libel statutes are *per se* unconstitutional").

In *Garrison v. Louisiana*, 379 U.S. 64 (1964), the Supreme Court struck down Louisiana's criminal libel statute which incorporated "constitutionally invalid standards in the context of criticism of the official conduct of public officials." *Id*. at 77-78. Thus, *Garrison's* statements about how criminal libel statutes might sometimes theoretically be constitutional are dicta. And, in any event, that dicta does not support a contention that the Statute at issue here is constitutional. That is because criminal libel laws are premised on a fundamentally different state interest than campaign-speech restrictions like this Statute.

As described in *Garrison* (and recognized by the North Carolina Supreme Court (*see* n. 6, *supra*), criminal libel "was designed to avert the possibility that the utterance

---

[6] In North Carolina, criminal libel is truly vestigial. Apart from N.C. Gen. Stat. § 163-274(a)(9), the only North Carolina statute embodying criminal libel appears to be N.C. Gen. Stat. § 14-47, which purports to make it a misdemeanor to "secure the publication" of a "false and libelous statement" transmitted "to the manager, editor, publisher or reporter of any newspaper or periodical." In 1975, the General Assembly repealed a companion criminal libel statute, N.C. Gen. Stat. § 14-48, which made it a misdemeanor to attempt to "destroy the reputation of an innocent woman by words, written or spoken." Neither statute has been discussed in any reported North Carolina decision in over 60 years. *See Gillikin v. Bell*, 254 N.C. 244, 246, 118 S.E.2d 609, 610 (1961) (noting only that the General Assembly had "enlarged the class of things which are criminal because defamatory" beyond the common law by enacting N.C. Gen. Stat. §§ 14-47 & 14-48). The court in *Gillikin* noted the common-law rationale for criminal libel: "Since libel is apt to create a breach of peace, it is a common law crime." *Id*. at 246, 118 S.E.2d at 610.

8

would provoke an enraged victim to a breach of peace." 379 U.S. at 67. In *Garrison*, in striking down the Louisiana criminal statute, the Court noted that because "the civil [libel] remedy had virtually pre-empted the field of defamation except as a weapon against seditious libel, the criminal prosecution fell into virtual desuetude." *Id*. at 69. In fact, the *Garrison* Court held that "the absence of any limitation in the statute itself to speech calculated to cause breaches of the peace, leads us to conclude that the Louisiana statute is not this sort of narrowly drawn statute." *Id*. at 70.

In contrast, the claimed compelling state interest in campaign-speech restrictions is protection of the electorate from fraud. *See*, *e.g.*, *Susan B. Anthony List*, 814 F.3d at 473; *see also* Doc. 14, at 2. Any attempt, therefore, to justify the criminalizing of campaign speech by reference to criminal libel laws improperly conflates differing state interests – on the one hand, in avoiding breaches of the peace and, on the other, in protecting the electorate from fraud.

Indeed, the Supreme Court plurality in *Alvarez*, clarified that the *Garrison* dicta (along with dicta from other cases), "all derive from cases discussing defamation, fraud, or some other legally cognizable harm associated with a false statement," 567 U.S. at 719, which cannot be imported from those contexts to the "far greater realm of discourse and expression." *Id*. The Supreme Court plurality went on to reject the Government's argument that these rationales for fundamentally different kinds of statutes are interchangeable:

> The Government thus seeks to use this principle for a new purpose. It seeks to convert a rule [*i.e.*, the limitation of libel to knowing falsehoods] that limits liability even in defamation cases where the law permits recovery for tortious

9

wrongs into a rule that expands liability in a different, far greater realm of discourse and expression. That inverts the rationale for the exception. The requirements of a knowing falsehood or reckless disregard for the truth as the condition for recovery in certain defamation cases exists to allow more speech, not less. A rule designed to tolerate certain speech ought not blossom to become a rationale for a rule restricting it.

*Id*.

The continuing theoretical existence of criminal libel, therefore, provides no support for the campaign-speech restrictions found in the Statute.[7]

### III. Rather than Creating Procedural Protections for Persons Exercising First Amendment Rights, the North Carolina Statutory Regime Vests Potential Charging Authority as Broadly as Possible with Virtually No Protections.

North Carolina's statutory regime – either by design or, more likely, inadvertence – creates a procedural morass in which every citizen can lodge a charge against a person

---

[7] Also irrelevant to this inquiry is the North Carolina Supreme Court's decision in *State v. Petersilie*, 334 N.C. 169, 432 S.E.2d 832 (1993), which upheld a statute (referred to by Defendant as "adjacent" to N.C. Gen. Stat. 163-274(a)(9)) criminalizing anonymous political speech. It has no bearing on this case for three reasons. First, the North Carolina court was upholding a different statute, based on a different rationale, and not the Statute at issue here. Second, just two years after *Petersilie*, the United States Supreme Court overturned a similar Ohio statute criminalizing anonymous speech, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995), calling into question the validity of the North Carolina statute upheld in *Petersilie*. *See id*. at 376 & n.2 (Scalia, J., dissenting) (noting the 24 States with similar laws to the Ohio law stricken down). Third, the analysis conducted by the North Carolina Supreme Court in *Petersilie* did not embody the level of exacting scrutiny required today, particularly post-*Alvarez*. *See Petersilie*, 334 N.C. at 203, 432 S.E.2d at 852 (Mitchell, J., dissenting) ("the burdensome restrictions of N.C.G.S. § 163–274(7) are not necessary to serve that interest and most certainly are not narrowly drawn to achieve that end") (internal quotation omitted). In the words of one commentator, "the majority and dissenting opinions in *Petersilie* bear a strong resemblance to those filed by the majority and dissent in *McIntyre*, only reverse." Richard K. Norton, *McIntyre v. Ohio Elections Commission*: Defining the Right to Engage in Anonymous Political Speech, 74 N.C. L. Rev. 553, 583 n. 166 (1996).

10

engaged in political speech and virtually no procedural protections are provided to persons accused of illegal campaign speech.

As discussed earlier, in *Susan B. Anthony List v. Driehaus*, 814 F.3d 466 (6th Cir. 2016), one of the (five) reasons for finding that the Ohio law at issue did "not pass constitutional muster" was that it was not "narrowly tailored" because it "lack[ed] a screening process for frivolous complaints." *Id*. at 474. As the court put it, "Ohio fails to screen out frivolous complaints prior to a probable cause hearing." *Id*.

The Sixth Circuit noted that while the Ohio statute permitted a panel of the Ohio Elections Commission "to review and reach a probable cause conclusion on complaints as quickly as possible, it also provides frivolous complainants an audience and requires purported violators to respond to a potentially frivolous complaint." 814 F.3d at 474. The court also indicated concern "'[b]ecause the universe of potential complainants is not restricted to state officials who are constrained by explicit guidelines or ethical obligations, there is a real risk of complaints from, for example, political opponents.'" *Id*. (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014)). Other procedural concerns identified by the Sixth Circuit were the lack of "process for screening out frivolous complaints or complaints that, on their face, only complain of non-actionable statements, such as opinions," *id*. at 474-75, and the fact that complainants could "use the law's process 'to gain a campaign advantage without ever having to prove the falsity of a statement ... tim[ing] their submissions to achieve maximum disruption ... forc[ing political opponents] to divert significant time and resources ... in the crucial days leading up to an election.'" *Id*. at 475 (quoting *Driehaus*, 573 U.S. at 165).

11

Ohio's procedural protections, while deemed deficient by the Sixth Circuit, are genuinely robust by the lax standards of the North Carolina Statute. In Ohio, it is true, complaints could be filed by "[a]ny person including the Secretary of State or a Board of Elections official" with the Ohio Elections Commission. 814 F.3d at 469-70. After that filing, however "there [wa]s a three-step process to be convicted of the crime of making a political false statement":

> First, a panel of the Commission conducts a preliminary probable cause hearing based on the complaint and issues a public finding. [Second, i]f the panel finds probable cause, the complaint proceeds to an adjudicatory hearing before the full Commission. [Third, i]f, after the adjudicatory hearing, the Commission finds by *clear and convincing evidence* that a party violated the political false-statements laws, it may refer the case to a prosecutor.

*Id*. (emphasis added).

Yet, despite those procedural protections designed to result in referral to a prosecutor only after satisfying each of the three steps in that process, including a formal determination of probable cause at two stages, the second time "by clear and convincing evidence," the Sixth Circuit still found the procedural protections deficient. As noted above, the court faulted the Ohio statutory regime for "fail[ing] to screen out frivolous complaints *prior* to a probable cause hearing. 814 F.3d at 474 (emphasis added). The court also found it problematic that the "universe of potential complainants is not restricted to state officials who are constrained by explicit guidelines or ethical obligations" leading to the "real risk of complaints" from "political opponents." *Id*.

In all pertinent ways, the North Carolina procedural regime, while admittedly complex, is far worse than Ohio's. Instead of funneling accusations regarding political

12

speech to protect against improper prosecutions, as Ohio's regime did, North Carolina's process multiplies those opportunities.

The Board of Elections' general statutory authority related to this case (as cited by the Board's counsel) is found in N.C. Gen. Stat. § 163-22, a section titled "Powers and duties of State Board of Elections." Specifically subsection (d) provides that:

> The State Board of Elections shall investigate when necessary or advisable, the administration of election laws, frauds and irregularities in elections in any county and municipality and special district, and shall report violations of the election laws to the Attorney General or district attorney or prosecutor of the district for further investigation and prosecution.

The statute, however, provides no guidance regarding when an investigation is "necessary or advisable" or on what basis the Board should determine a "violation" required to be reported.[8]

A further specific provision relating to Article 22 of Chapter 163 (which contains the Statute) is found in N.C. Gen. Stat. § 163-278 (titled "Duty of investigating and prosecuting violations of this Article"). It states in pertinent part that "[i]t shall be the duty of the State Board of Elections and the district attorneys to investigate any violations of this Article" and provides that the "State Board and the district attorneys are authorized to call upon the Director of the State Bureau of Investigation to furnish assistance by the State Bureau of Investigation in making the investigations of such violations." It also provides that the "State Board shall furnish the district attorney a copy of its investigation" and the

---

[8] Plaintiffs have subpoenaed the Report of the former-defendant Board of Elections in order to determine what specifically was referred to the district attorney in this case and what standards, if any, were followed. Plaintiffs expect to be able to provide that Report to the Court at the preliminary injunction hearing set for later this week.

13

"district attorney shall initiate prosecution and prosecute any violations of this Article." Finally, by incorporation, the statute states that "[t]he provisions of G.S. 163-278.28 shall be applicable to violations of this Article."

That incorporated statute, in turn, provides in pertinent part for yet *another* potential actor who may punish political speech, a "special prosecutor":

> If the Board makes a report to a district attorney under application G.S. 163-278.27 and no prosecution is initiated within 45 days after the report is made, any registered voter of the prosecutorial district to whose district attorney a report has been made, or any board of elections in that district, may, by verified affidavit, petition the superior court for that district for the appointment of a special prosecutor to prosecute the individuals or persons who have or who are believed to have violated any section of this Article. Upon receipt of a petition for the appointment of a special prosecutor, the superior court shall issue an order to show cause, directed at the individuals or persons alleged in the petition to be in violation of this Article, why a special prosecutor should not be appointed. If there is no answer to the order, the court shall appoint a special prosecutor. If there is an answer, the court shall hold a hearing on the order, at which both the petitioning and answering parties may be heard, to determine whether a prima facie case of a violation and failure to prosecute exists. If there is such a prima facie case, the court shall so find and shall thereupon appoint a special prosecutor to prosecute the alleged violators.

N.C. Gen. Stat. § 163-278.28(b). Note that with this statute, the burden is on the accused to show cause why the prosecutor "should not be appointed" after only a prima facie showing, N.C. Gen. Stat. § 163-278.28(b)

Finally, under North Carolina law *any person* can simply swear out a misdemeanor charge regarding violation of the Statute and obtain a criminal summons or even warrant for arrest as issued by a non-lawyer magistrate. *See* N.C. Gen. Stat. §§ 15A-303, -304.

As a practical matter, this agglomeration of statutes allows for up to three State entities and any citizen to each make an independent and essentially standardless decision

14

to initiate prosecution of political speech: (i) the Board of Elections (at its own behest or that of a complaining candidate or other person), (ii) any of 42 elected district attorneys (either with or without the concurrence of the Board of Elections), (iii) a special prosecutor, in lieu of a district attorney who chooses not to prosecute, as sought by any registered voter or county board of elections member, or (iv) any citizen who feels aggrieved and swears out a misdemeanor charge.

In other words, in contrast with Ohio, where only a three-step funnel can result in a criminal charge – and which was *still* found to be unconstitutional by the Sixth Circuit, 814 F.3d at 474-75 – North Carolina provides a patchwork of overlapping investigatory and charging authorities, each of whom can effectively overrule every other. Although the Statute does not appear to have been invoked in the past, the number of potential persons who can seek to punish political speech with few, if any, procedural protections is prodigious.

As demonstrated by this statutory train wreck, the North Carolina regime appears designed to provide fewer protections to a criminally accused publisher of core political speech than to a person accused of petty larceny. As in *Susan B. Anthony List*, the North Carolina procedures are entirely deficient and violate the First Amendment.

15

Case 1:22-cv-00568-CCE-JLW   Document 19   Filed 08/01/22   Page 15 of 20

## IV. *Pullman* Abstention is Unwarranted[9]

While maintaining there is nothing "unclear" about the Statute, Defendant, at the same time, attempts to invoke the *Pullman* abstention doctrine – an abstention doctrine reserved for "open questions of state law." (*See* Doc. 14 at 5 & n.1; Doc. 15 at 4.) Abstention under *Railroad Commission of Texas v. Pullman*, 312 U.S. 496 (1941) is inappropriate here.

The general rule is that "federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress." *United States v. South Carolina*, 720 F.3d 518, 526 (2013) (quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996)). *Pullman* abstention is one of the narrow exceptions to that rule, and is appropriate only where "(1) there is 'an unclear issue of state law presented for decision'; and (2) resolution of that unclear state law issue 'may moot or present in a different posture the federal constitutional issue such that the state law is potentially dispositive.'" *Moore v. Circosta*, 494 F. Supp. 3d 289, 308 (M.D.N.C. 2020) (quoting *Educ. Servs., Inc. v. Md. State Bd. for Higher Educ.*, 710 F.2d 170, 174 (4th Cir. 1983)). The burden is on the Defendant to demonstrate that abstention is warranted. *Id.* (defendant would "need to show how resolution of state law issues pending in state court would eliminate or substantially modify the federal constitutional issues raised" in the complaint).

---

[9] Defendant concedes, by omission, that *Younger* abstention does not apply. *See Younger v. Harris*, 401 U.S. 37 (1971). *Younger* is "inapplicable, where, as here, state proceedings have not yet begun against the federal plaintiffs and the plaintiffs seek injunctive relief to protect their constitutional rights." *United States v. South Carolina*, 720 F.3d 518, 527-28 (2013) (holding that *Younger* does not "bar the granting of federal injunctive relief" when there is no "ongoing" state criminal proceeding, even if one is "expected and imminent").

16

*Pullman* abstention is unwarranted here for at least three reasons. *First*, there is no "unclear issue of state law presented for decision." Indeed, the Board of Elections (whose positions were incorporated by reference by the Defendant) "does not take the position that the Statute is unclear." (Doc. 14 at 5 n.1.) Instead, Defendant appears to argue that the law is unclear because it "suffers from a lack of judicial interpretation," is "archaic," and "has not been the subject of a reported case." *Id.* But the fact that a vestigial North Carolina statute has been so rarely (if ever) enforced for 91 years does not mean the statute presents any "unclear issues of state law." By that standard, it would be virtually impossible to know when a law had developed enough caselaw to no longer involve "unclear issues of state law." In any event, courts have repeatedly rejected this attempt to fashion ambiguity from a vacuum of judicial interpretation. *See North Carolina State Conference of NAACP v. Cooper*, 397 F. Supp. 3d 786, 793-98 (M.D.N.C. 2019) (rejecting North Carolina Board of Elections' *Pullman* abstention argument); *see also FDIC v. Am. Bank Trust Shares, Inc.*, 558 F.2d 711, 715 n.11 (4th Cir. 1977) (*Pullman* abstention is inappropriate even when "there is little or no state authority bearing upon the … statutes in question."); *accord Harman v. Forssenius*, 380 U.S. 528, 534-35 (1965) ("If the state statute in question, although never interpreted by a state tribunal, is not fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question, it is the duty of the federal court to exercise its properly invoked jurisdiction.").

*Second,* Defendant does not even attempt to meet the burden of identifying a single "state law issue," or construction of state law, that would "eliminate or substantially modify the federal constitutional issues" raised here. *See Zwickler v. Koota*, 389 U.S. 241, 251 n.

17

14 (1967) (The Supreme Court has "frequently emphasized that abstention is not to be ordered unless the state statute is of an uncertain nature, and is obviously susceptible of a limiting construction"). That burden is on the Defendant. The Court cannot simply defer to an unidentified state law issue that *could* theoretically arise if a state court were to be given first crack at interpreting the statute. That would require abstention in *every* case that involves a constitutional issue under 28 U.S.C. § 1983. *See id.* at 251 ("[A]bstention cannot be ordered simply to give state courts the first opportunity to vindicate a federal claim.").

*Finally*, abstention, which is the exception and not the rule, is "strongly disfavored in First Amendment cases." *Chula Vista Citizens for Jobs and Fair Competition v. Norris*, 782 F.3d 520, 528 (9th Cir. 2015) (citing *City of Houston v. Hill*, 482 U.S. 451, 467-68 (1987)). Courts "have been particularly reluctant to abstain in cases involving facial challenges based on the First Amendment," *North Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 711 n.1 (4th Cir. 1999) (quoting *City of Houston*, 482 U.S. at 467), "because the delay involved 'might itself effect the impermissible chilling of the very constitutional right [the litigant] seeks to protect,'" *id.* (quoting *Zwickler*, 389 U.S. at 252). Abstention in cases like this would defeat the purposes of § 1983, which is intended to give plaintiffs an alternative federal forum to raise constitutional issues. *See NAACP*, 397 F. Supp. 3d at 798 (rejecting *Pullman* argument from State Board of Elections and noting abstention is "contrary to the purpose of Congress" in § 1983.).

The issues raised here are squarely within this Court's jurisdiction and there is no reason to abstain from resolving them to protect Plaintiffs' constitutional rights.

18

Case 1:22-cv-00568-CCE-JLW   Document 19   Filed 08/01/22   Page 18 of 20

# CONCLUSION

For the reasons stated herein and in their previous Memorandum, Plaintiffs respectfully request that Defendant be preliminarily enjoined from enforcing N.C. Gen. Stat. § 163-274(a)(9).

This the 1st day of August, 2022.

By: /s/ Pressly M. Millen<br>
Pressly M. Millen<br>
State Bar No. 16178<br>
Raymond M. Bennett<br>
State Bar No. 36341

OF COUNSEL:

WOMBLE BOND DICKINSON (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, North Carolina 27601
(919) 755-2100

Attorneys for Plaintiffs
Juliette Grimmett, Ralston Lapp Guinn Media Group,
and the Josh Stein for Attorney General Campaign

**CERTIFICATION OF WORD COUNT**

Pursuant to Local Rule 7.3(d)(1), I hereby certify that this memorandum, including headings and footnotes, contains fewer than 6,250 based on the word count feature of Microsoft Word, and therefore complies with the Rule.

August 1, 2022                                                                /s/ Pressly M. Millen