IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Case No. 1:22-CV-568

| | |
|---|---|
| JULIETTE GRIMMETT, RALSTON LAPP GUINN MEDIA GROUP, and the JOSH STEIN FOR ATTORNEY GENERAL CAMPAIGN, <br><br> Plaintiffs, <br><br> v. <br><br> DAMON CIRCOSTA, in his official capacity as Chair of the North Carolina State Board of Elections, STELLA ANDERSON, in her official capacity as Secretary of the North Carolina State Board of Elections, JEFF CARMON III, in his official capacity as Member of the North Carolina State Board of Elections STACY EGGERS IV, in his official capacity as Member of the North Carolina State Board of Elections, TOMMY TUCKER, in his official capacity as Member of the North Carolina State Board of Elections, and N. LORRIN FREEMAN in her official capacity as District Attorney for the 10th Prosecutorial District of the State of North Carolina, <br><br> Defendants. | **PLAINTIFF'S REPLY TO SUPPLEMENTAL MEMORANDUM OF DEFENDANT** |

## INTRODUCTION

This is a case about whether nine words in a political advertisement – "O'Neill left 1,500 rape kits sitting on a shelf" – can be criminally prosecuted as "false" under N.C. Gen. Stat. § 163-274(a)(9) without running afoul of the First Amendment's prohibition on abridgment of free speech. Defendant's filing makes it clear that she seeks to wield an

archaic statute on behalf of a sore-loser fellow district attorney to transform an intramural political dispute about the responsibility for untested rape kits into a criminal prosecution concerning political speech.

There is no question that as of the date of the issuance of the 2017 Report ordered by the Attorney General cataloging the backlog of untested rape kits, there were 1,509 such kits languishing at the five Forsyth County law enforcement agencies that District Attorney O'Neill was constitutionally obligated to advise.[1]

Yet, the simple fact is that there is a straightforward construction of those nine words which is clearly true. The operative verb in the allegedly criminal phrase – "left," the past tense of the verb "leave" – implies nothing about possession, chain of custody, or strict legal responsibility. In fact, the *Oxford English Dictionary* gives a definition of the verb which is entirely consistent with a truthful construction here: "[a]llow to remain; let remain in the same place or in a specified condition by refraining from consuming or otherwise acting on." Vol. 1, *Shorter Oxford English Dictionary* (5th ed. 2002), at 1564.[2] To use the standard English phrase "leave alone" describes precisely what O'Neill did with respect to the untested rape kits in Forsyth County; he "left" them alone. By using the verb's past-tense form "left," *Survivor* did not state that O'Neill had possession of the untested rape kits or even a legal responsibility to do something with them. Instead, those nine words

---

[1] Section 18 of Art. IV of the North Carolina Constitution provides that a "District Attorney shall advise the officers of justice in his district [and] be responsible for the prosecution on behalf of the State of all criminal actions in the Superior Courts of his district."
[2] The *American Heritage College Dictionary* (3d ed. 1997), at 773 offers a similar definition of "leave": "[t]o cause or allow to be or remain in a specified state."

2

simply state the truth that O'Neill, by allowing them to "remain" languishing at the law enforcement agencies he had a constitutional duty to advise – in their "specified" untested "condition" – was manifesting an indifference to the rape kits, an accurate fact that North Carolina voters were entitled to know, particularly in light of his claim that the issue was a top priority for him.

That Defendant may concoct an elaborate construction of the nine words that gives them a false construction is beside the point. The words – at most – are ambiguous and any prosecution founded on an ambiguous construction would make a travesty of the First Amendment.

## ARGUMENT

I. **Defendant is Bereft of Any Authority Supporting the Constitutionality of the Statute.**

    A. **The Continuing Validity of Criminal Libel has No Bearing on this Case.**

As stated in their Supplemental Brief (at 7-8), Plaintiffs do not contend that all criminal libel statutes are necessarily unconstitutional. Plaintiffs' argument is a narrower one, namely that the arguably compelling state interests supporting criminal or civil libel laws – avoiding breaches of the peace and compensating individuals for reputational damage – cannot provide a compelling state interest for a criminal campaign-speech prohibition which must be based on a different state interest, *i.e.*, preserving the integrity of elections.

The three-part test for surviving strict scrutiny under the First Amendment requires the government to demonstrate three *interrelated* requisites: (1) a compelling state interest,

3

(2) which serves and achieves that interest, (3) in a narrowly tailored manner. *See Stuart v. Huff*, 834 F. Supp. 2d 424, 429 (M.D.N.C. 2011) (requiring a "compelling interest" which is "narrowly tailored" to "*serve*" that compelling government interest," emphasis added, quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009)). Those three requisites, therefore, are not discrete and unconnected from one another.

As the Supreme Court held in *United States v. Alvarez*, to simply "recite the Government's compelling interests is not to end the matter." 567 U.S. 709, 725 (2012). Instead, "[t]he First Amendment requires that the Government's chosen restriction on the speech at issue be actually necessary to achieve its interest." *Id*. (internal quotation omitted). Rather, "[t]here must be a direct causal link between the restriction imposed and the injury to be prevented." *Id*. In other words, the government may not articulate one claimed compelling interest – here protecting voters from fraud – which, instead of serving that interest serves a different state interest, the protection of the reputation of an allegedly maligned candidate.

It was this "bait-and-switch" which Plaintiffs' counsel warned against at the TRO hearing. Prosecution of the Plaintiffs and others here might somehow restore the reputation and salve the hurt feelings of District Attorney O'Neill, but it will not serve the interests of protecting the electorate from fraud. Indeed, the Supreme Court in *Alvarez* explicitly rejected this bait-and-switch approach when it required the "direct causal link" described above, 567 U.S. at 725, and refused to adopt a defamation-interest rationale as the basis for punishing the defendant in that case, *id*. at 719, holding that this approach "inverts the rationale" by improperly seeking to utilize the principle of "reckless disregard for the truth

4

as the condition for recovery in certain defamation cases" as "a rationale for a rule restricting [speech]." *Id*.

For that reason, the continuing viability of criminal libel generally, whether as found in the dicta in *Garrison v. Louisiana*, 379 U.S. 64, 75 (1964), or in the more recent New Hampshire non-political speech case, *Freese v. MacDonald*, 512 F. Supp. 3d 273 (D.N.H. 2021), *appeal filed sub. nom. Freese v. Formella* (1st Cir. Jan. 27, 2021), simply has no bearing on the constitutionality of N.C. Gen. Stat. § 163-274(a)(9), which is based on a claimed compelling state interest in protecting elections and not a state interest in soothing the hurt feelings of the allegedly defamed. O'Neill could have pursued a civil libel claim for that purpose, but chose not to do so. Therefore, unlike the Plaintiff in *Frese*, Plaintiffs here are not contending that *Garrison* "was wrongly decided," *Frese*, 512 F. Supp. 2d at 285, but only that it is entirely beside the point in the context of a statute designed not to vindicate the rights of those allegedly criminally libeled, but instead to promote untainted elections.

**B.  Defendant's New Authorities are Inapposite.**

Nor do the four cases identified by Defendant (Def. Mem. at 9-10) provide any support for the constitutionality of N.C. Gen. Stat. § 163-274(a)(9). One of those cases – *Myers v. Thompson*, 192 F. Supp. 3d 1129 (D. Mont. 2016) – has already been distinguished in Plaintiffs' Supplemental Memorandum (at p. 6 n.5) on the ground that it too, like the criminal libel cases discussed above, was premised on a **different** articulated a state interest, *i.e.,* the importance of public confidence in the judiciary, *id*. at 1139, an interest not present here. The court explicitly recognized that judiciary-specific rationale

5

as distinct from "the executive or the legislature, [because] the judiciary 'has no influence over either the sword or the purse; …neither force nor will but merely judgment.'" *Id*. (quoting *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 445 (2015) (quoting, in turn, The Federalist No. 78, p. 465 (C. Rossiter ed. 1961) (A. Hamilton) (ellipsis in original)). That articulation of the state's interest cannot support speech restrictions outside the judiciary.

For that same reason, Defendant's other judicial case – *Winter v. Wolnitzek*, 834 F.3d 681 (6th Cir. 2016) – is also inapposite here. In that case, the court struck down most of the challenged provisions in the Kentucky canons of judicial conduct relating to judicial campaigns for election. *See id*. at 689-94. With respect to one of those provisions – a "false statements clause" – the court held that it was facially constitutional although it did not survive an as-applied challenge concerning a judge (appointed in the first instance) who asked voters to "re-elect" her. *Id*. at 693. Most pertinently for this case, the court's finding of facial constitutionality was, as in *Myers*, *supra*, specifically premised on "preserving public confidence in the fairness and integrity of [Kentucky's] judiciary," which the court explicitly found to be a "narrower interest" than "Ohio's purported interest in protecting voters in other elected races from misinformation," as held in *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 475 (6th Cir. 2016). 834 F.3d at 693. In short, the court's reasoning was, again, based on a critical distinction between judicial elections and other political campaigns in which the rule enunciated in *Susan B. Anthony List* prevails. For

that reason, *Winter* supports Plaintiffs' position here. Importantly, neither the speech restriction in *Myers* nor that in *Winter* purported to exact criminal penalties.[3]

For similar reasons, *Make Liberty Win v. Cegavske*, 570 F. Supp. 3d 936 (D. Nev. 2021), is readily distinguishable from this case. In upholding the facial validity of two Nevada statutes that narrowly barred candidates and their supporters from using the word "re-elect" when not the current incumbent (or to falsely imply incumbency), the court relied on the narrow scope of the laws at issue, holding that they did "not attempt to give Nevada carte blanche authority to nitpick political candidates on debatable issues," but rather "measuredly restrict[] candidates and their supporters from falsely claiming that they are incumbents when they are not." *Id*. at 943 (distinguishing *281 Care Committee v. Arneson*, 766 F.3d 774, 787 (8th Cir. 2014), on that ground). Even then, the court, applying strict scrutiny, granted an as-applied challenge finding that proscribing use of the word "re-elect," when applied to a previously elected but not currently incumbent candidate was impermissible. *Id*. at 942-43.

---

[3] Another case cited by Defendant in the context of judicial elections, *Linert v. MacDonald*, 901 N.W.2d 664 (Minn. 2017), utilized different reasoning in upholding a statute which targeted a "false claim stating or implying that a candidate…has the support or endorsement of a major political party or party unit or an organization." *Id*. at 667 (quoting Minn. Stat. § 211B.02). The state court reasoned that the narrow subject matter of the statute "ensure[d] that the statute does not target broad categories of speech." *Id*. at 669 (internal quotation omitted). The court also relied on statutory "procedural safeguards to protect against…abuse," including three-day mandatory prima facie review by an ALJ, followed by an expedited probable cause hearing, and an evidentiary hearing before a three-judge panel. *Id*. at 670. In contrast, N.C. Gen. Stat. § 163-274(a)(9) broadly reaches any and all "derogatory" reports without any of the timing and procedural protections offered by the Minnesota regime.

For these reasons, Defendant's new authority provides little if any support for her position.

### C. Defendant Fails to Distinguish the Most Pertinent Authority.

More problematic, though, is Defendant's continuing inability to distinguish the four cases most closely on-point, which struck down similar criminal campaign-speech restrictions in Ohio,[4] Massachusetts,[5] Minnesota,[6] and Washington.[7] As noted earlier, Defendant's opening brief failed entirely to address these authorities. While Defendant now appears to concede that strict scrutiny is the appropriate test (*see* Def. Supp.11), her attempts to distinguish those cases are unavailing. (In fact, Defendant still fails to address the Massachusetts and Washington supreme court cases at all.)

Defendant's attempt to distinguish *Susan B. Anthony List* (Def. Supp. 10-15), is primarily composed of *ipse dixit* statements that the Sixth Circuit was simply wrong. Thus, with respect to the issue of the inability of the Ohio statute to timely address a claimed falsehood during the pendency of the election, 814 F.3d at 474, something it shares with the North Carolina statute, Defendant states only that the Sixth Circuit offered "no precedent" for its concerns[8] and that "[i]t is difficult to understand how that compelling

---

[4] *Susan B. Anthony List v. Driehaus,* 814 F.3d 466 (6th Cir. 2016)
[5] *Commonwealth v. Lucas*, 472 Mass. 387 (2015).
[6] *281 Care Committee v. Arneson*, 766 F.3d 774 (8th Cir. 2014).
[7] *Rickert v. State*, 161 Wash. 2d 843 (2007).
[8] Actually, the court *did* cite Supreme Court precedent for its timing concerns, the Supreme Court's earlier decision in the case itself. *See* 814 F.3d at 474 (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 166 (2014)).

8

state interest [*i.e.*, "preserving integrity in elections"] could be minimized simply because the prosecution occurs after, rather than before, the affected election." (Def. Supp. at 12.)

In fact, it is not at all difficult to understand. If the false statement could somehow be addressed before the election, prosecution might conceivably serve to preserve the election's integrity. If though, as in Ohio and North Carolina, the false statement can only be prosecuted *after* the election, that *post-hoc* punishment fails to serve the articulated state interest and, instead, only serves the *in terrorem* purpose of chilling future speech, both by the accused and by others who would engage in similar political speech. 874 F.3d at 474 (a "final finding that occurs *after* the election does not preserve the integrity of the election" (emphasis in original)).

Defendant's discussion of the Ohio statute's "screening" problems (Def. Supp. 12-13) is equally obtuse. As noted in Plaintiffs' Supplemental Memorandum (at 11), the Sixth Circuit found that the Ohio statutory regime – despite elaborate post-complaint protections – "fail[ed] to screen out frivolous complaints *prior* to a probable cause hearing." 814 F.3d at 474 (emphasis added). North Carolina's regime, as discussed at length (Pls. Supp. 13-15), provides no comparable protections (deemed inadequate by the Sixth Circuit in any event), but actually creates more ways this political-speech crime can be charged than any other class 2 misdemeanor. To argue, as Defendant does, that "*Driehaus* is plainly distinguishable on this basis" (Def. Supp. 13), is nonsense.

Next, Defendant is wrong when she states that the addition of the word "derogatory" in the North Carolina statute along with the requirement that the speech be "calculated or intended to affect the chances" of a candidate satisfies a materiality standard missing from

9

the Ohio statute. (Def. Supp. 13.) A false claim, for example, that "O'Neill drives a gas guzzler" might be considered "derogatory" by some and might be subjectively calculated by its publisher to affect the election. Those two premises, however, would not make the representation material. Nor would they address the Sixth Circuit's concern that "[p]enalizing non-material statements, particularly those made outside the political arena, is not narrowly tailored to preserve fair elections." 814 F.3d at 475.

With regard to the Sixth Circuit's concern that commercial intermediaries beyond the speaker could be swept up by the language of the statute, 874 F.3d at 475, rather than distinguish *Susan B. Anthony List*, Defendant argues only that the "Sixth Circuit fails to acknowledge that a commercial intermediate [*sic*] could only be prosecuted if it knew of was recklessly indifferent to the falsity of the political speech at issue." (Def. Supp. 14.) Here, the North Carolina Statute, by virtue of its language that purports to cover all who "publish or cause to be circulated" the political speech at issue, offers a wide net to potential complainants and prosecutors to sweep in not only speakers but a wide variety of others including commercial intermediaries such as television stations.

Finally, Defendant's discussion of over- and under-inclusiveness (Def. Supp. 14-15) misses the point entirely. The Sixth Circuit found the cognate Ohio statute over-inclusive because an accusation against a political speaker might "[c]aus[e] damage to a campaign that ultimately may not be in violation of the law," and, "[a]t the same time," under-inclusive because it "may not timely penalize those who violate it." 814 F.3d 475. Defendant's argument entirely fails to grapple with those concerns. (Defendants also do not address the under-inclusiveness concern in the holding of the Washington Supreme

10

Court in *Rickert*, namely that the statute addressed only false speech maligning an opponent, but not false speech about oneself. 161 Wash.2d at 853 ("[b]asically a candidate is free to lie about himself")).

In short, Defendant's contention that *Driehaus* "is readily distinguishable" (Def. Supp. 15), is wrong.

Defendant's even more perfunctory attempt to distinguish the Eighth Circuit's reasoning in *281 Care Committee* is also unsuccessful. (*See* Def. Mem. 15-17.) Defendant tries to distinguish the case based on three factors identified by that court: (1) that "'anyone' could lodge a complaint," (2) that counterspeech was "available" and the "least restrictive means to satisfy the state interest," and (3) certain under-inclusivity issues with the Minnesota law. (Def. Supp. 16.)

In point of fact, the North Carolina Statute, like Minnesota's (and Ohio's), suffers from the anyone-can-file debility, which, in the words of the Eighth Circuit, "tends to perpetuate the very fraud it is allegedly designed to prohibit," *i.e.*, permitting political opponents to "file[] at a tactically calculated time so as to divert the attention of an entire campaign." 766 F.3d at 789-90. Defendant, moreover, offers no explanation for why counterspeech – the means most consonant with First Amendment values generally – is insufficient. Finally, as with her perverse argument regarding the additional procedural protections in the Ohio law, the fact that those additional protections did not save the Minnesota law cannot serve as a constitutional imprimatur for North Carolina's regime lacking *any and all* procedural protections, which, as Defendant puts it, requires only "a finding of probable cause by a judicial officer or grand jury." (Def. Supp. 16.)

11

## II. Abstention is Unwarranted.

Defendant's abstention arguments ping-pong between seeking *Pullman* abstention and seeking *Younger* abstention. In their Supplemental Memorandum (at 16-18), Plaintiffs explained why *Pullman* abstention was inappropriate in this case. Now, in her Supplemental Memorandum, Defendant appears to have retreated to *Younger* abstention. It, too, is inappropriate.

The primary defect with Defendant's *Younger* contentions is that the doctrine is simply "inapplicable where, as here, state proceedings have not begun against the federal plaintiffs and the plaintiffs seek injunctive relief to protect their constitutional rights." *United States v. South Carolina*, 720 F.3d 518, 527-28 (2013) (holding that *Younger* does not "bar the granting of federal injunctive relief" when there is no "ongoing" state criminal proceeding, even if one is "expected and imminent"). Defendant cannot seek to have this Court abstain in favor of a non-existent state proceeding.

For the same reason, Defendant's contentions that a single criminal prosecution will not support irreparable harm under *Younger* is fallacious given that the stated principle applies only when the state criminal proceeding is actually pending. Defendant's own authority – *Gilliam v. Fisher*, 75 F.3d 881 (4th Cir. 1996) (en banc) – not only recognized the pendency requirement, it also refused to apply the *Younger* doctrine even in the face of an actual pending criminal prosecution. *Id*. at 904 ("ordinarily a *pending* state prosecution provides the accused a fair and sufficient opportunity for vindication of federal constitutional rights," emphasis added).

### III. Defendant's Contentions Concerning "Delay" by Plaintiffs are Factually Wrong and Legally Insufficient.

Defendant's claim that Plaintiffs have delayed and caused this proceeding to run up against the two-year statute of limitations is wrong on every level. To the extent that the events underlying this case have been marked by delays, those delays all lie with Defendant, including repetitive investigations by two separate governmental agencies – the Board of Elections and the SBI –, the SBI's delayed final report, and a months' long weighing by Defendant before finally settling on a course of action. To try to lay those delays at Plaintiffs' door is extremely cynical, especially in light of the fact that Plaintiffs fully cooperated in the investigation which concerned only the truth of nine words in a political advertisement.

The undisputed facts concerning timing are these: the Board of Elections opened its investigation no later than October 1, 2020. (Not. of Filing, Ex. 2 (Declaration of Ripley Rand, sworn to August 1, 2022 ("Rand Decl."), at ¶ 4.) The Board of Elections' investigator took no substantive action during the pendency of the 2020 Election. (*Id*. at ¶¶ 5-7.) After the Election, there was a four-month gap before the Board of Elections' investigators contacted Plaintiff Grimmett. (*Id*. at ¶ 8.) After a further four-and-a-half months delay, on July 14, 2021, the Board of Elections' investigator finally indicated that its investigation had concluded, nearly ten months after the filing of the original complaint.[9]

---

[9] As indicated in their Supplemental Memorandum, Plaintiffs had hoped to be able to provide the Court with the Report of the former-defendant Board of Elections which Plaintiffs had subpoenaed from it. The Board, however, has filed boilerplate objections and refused to provide that Report. (*See* Not. of Filing, Ex. 3.) The Board did, however, provide a Report from an earlier 2019 matter which, although heavily redacted, appears to

13

Defendant then determined to replicate that first investigation with the help of the SBI, a process that took a further six months through the end of 2021, some 15 months after the filing of the original complaint. (Rand Decl. ¶¶ 12-14.) Yet, as of February 25, 2022, two months *after* conclusion of the investigation, the SBI had still not provided Defendant with its report concerning the advertisement. (*Id*. at ¶ 15.) Only two months after that, did Defendant finally indicate receipt of the report. (*Id*. at ¶ 16.) From then, it took Defendant nearly *three more months*, from April 19 to July 7, 2022, to finally make the decision to move forward. (*Id*. at ¶ 18.)

Within one week of that, Plaintiffs' counsel sought a meeting with the senior prosecutor to discuss a number of issues related to the grand jury's review of a presentment. The senior prosecutor responded with several dates that he was available, and on July 15, 2022, the senior prosecutor agreed to a meeting on July 19, 2022. (Rand Decl. ¶ 19.)

At that meeting on July 19, 2022, Plaintiffs' counsel offered to seek a declaratory judgment on the issue of the constitutionality of the Statute before the initiation of any

---

raise serious questions about the constitutionality of the Statute, particularly in circumstances where the challenged speech is ambiguous. (*Id*. at Ex. 4 "applying [the Statute] to statements whose falsity is at all ambiguous may be an unconstitutional application of the statute.").) In her brief, Defendant filed a declaration from the SBI agent detailing the contents of his investigative report. She should not then be permitted to hide the State Board of Elections Report. At a minimum, Defendant should be required to answer four simple, but salient, questions concerning the Report:
1. Was the Report referred from the Board to the District Attorney as an official act of the Board or simply a staff-to-staff communication?
2. Did the Board's Report indicate concerns with the constitutionality of N.C. Gen. Stat. § 163-274(a)(9)?
3. Did the Board's Report find ambiguity in the language of *Survivor*?
4. Did the Board's Report recommend moving forward with prosecution?

grand jury review of the issues related to *Survivor*. (Rand Decl. ¶ 21.) At that same meeting, Plaintiffs offered a tolling agreement with respect to the statute of limitations in connection with that proposed process. (*Id*.) At the meeting, the senior prosecutor indicated that he would speak with the District Attorney concerning a declaratory judgment action and respond back to Plaintiffs' counsel. The very next day, July 20, 2022, the senior prosecutor called and informed Plaintiffs' counsel that the District Attorney would not agree to the declaratory judgment proposal but instead insisted on proceeding with the grand jury's review of the matter on Monday, July 25, 2022. (*Id*. at ¶ 22.)

This action was timely filed the very next day, less than 24 hours after that discussion. (*See* Rand Decl. ¶ 23.) It was thus as a result of Defendant's refusal to agree to an orderly process that Plaintiffs were required to seek emergency relief.

Even after issuance of the TRO in this matter, Defendant's counsel has sought to maintain an argument regarding the statute of limitations rather than allay it. On July 27, 2022, Plaintiffs' counsel proposed to Defendant's counsel, "[i]n order to provide [him] with time to deal with an appeal," a "combined hearing under Rule 65(a)(2) in mid-September (at Judge Eagles' convenience) with the TRO staying in place in the interim as a PI." (Not. of Filing, Ex. 2.) As a part of that proposal, Plaintiffs' counsel offered to "provide a tolling agreement through December 31, 2022" with the parties "agree[ing] to seek expedited briefing and argument of the district court's decision at the Fourth Circuit." (*Id*.) (Plaintiffs' counsel sought to reassure Defendant's counsel regarding the timing based on a recent experience in which counsel was "able to get from a trial court decision to a

15

Fourth Circuit decision in 75 days" even though the opponents were actually opposing expedited treatment. (*Id.*))

Defendant's counsel rejected that offer, insisting instead on an open-ended tolling agreement. (Not. of Filing, Ex. 2.) Plaintiffs' counsel responded that "in the hypothetical event that the court of appeals can't timely address the issue, we can address the issue then, either by agreement or by motion to the court." (*Id.*) When Plaintiffs' counsel also pointed out that under Plaintiffs' proposal, Defendant would "basically get three months of tolling which is better than where you are now" (*id.*), Defendant's counsel responded: "I talked with client and she is not willing to enter the type of closed end tolling agreement your clients propose; if they cannot agree to the type of tolling we had proposed then my client wants to go forward under current schedule." (*Id.*)

Defendant should not be permitted to manufacture inequities based on her own delays and subsequent refusal to enter a reasonable compromise. Until July 7, 2022, Plaintiffs had received no indication of any intent to proceed in the 21 months that the investigation had been pending. While Plaintiffs had been aware of the "investigation and the *possibility* of criminal charges," (Def. Supp. at 21 (emphasis added)), they had no reason to believe Defendant would actually pursue these unconstitutional charges. To the contrary, Plaintiffs had been in early and continuous communication with Defendant, cooperating in the investigation, requesting updates, and explaining why N.C. Gen. Stat. § 163-274(a)(9) is unconstitutional – conduct that furthers the equitable "goal of voluntary resolution of disputes without the need for litigation." *Rebel Debutante LLC v. Forsythe Cosm. Grp., Ltd.*, 799 F. Supp. 2d 558, 580 (M.D.N.C. 2011). If Plaintiffs had sued during

16

those discussions, that lawsuit would – appropriately – have faced standing and ripeness concerns. But once Defendant revealed her intent to seek the grand jury's review, Plaintiffs promptly offered a tolling agreement to avoid the need for emergency injunctive relief and then brought this action within 24 hours of Defendant's rejection of that offer.

Defendant is wrong to argue that Plaintiffs somehow undermined their claim to equitable relief by pursuing pre-dispute resolution and then suing as soon as Defendant revealed her intention to press forward. *See Turn & Bank Holdings, LLC v. Avco Corp.*, No. 19-CV-503, 2019 WL 4773667, at *11 (M.D.N.C. Sept. 20, 2019) (finding defendant's argument against irreparable harm not well-taken when plaintiff's alleged "delays" occurred before plaintiff "actually becom[ing] aware" of the event triggering the filing of the lawsuit); *see also Rebel Debutante*, 799 F. Supp. 2d at 580 (refusing, in injunction context, to find that a "six-month delay in bringing [the] action prevents a finding of a likelihood of irreparable harm" when the parties were actively engaged in "conciliation efforts to avoid the expense and time of litigation"). To the contrary, those efforts reveal why injunctive relief is necessary.

## CONCLUSION

For the reasons stated herein and in their previous Memoranda, Plaintiffs respectfully request that Defendant be preliminarily enjoined from enforcing N.C. Gen. Stat. § 163-274(a)(9).

This the 2nd day of August, 2022.

By: /s/ Pressly M. Millen
Pressly M. Millen

17

State Bar No. 16178<br>
Raymond M. Bennett<br>
State Bar No. 36341

OF COUNSEL:

WOMBLE BOND DICKINSON (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, North Carolina 27601
(919) 755-2100

Attorneys for Plaintiffs
Juliette Grimmett, Ralston Lapp Guinn Media Group,
and the Josh Stein for Attorney General Campaign

## CERTIFICATION OF WORD COUNT

Pursuant to Local Rule 7.3(d)(1), I hereby certify that this memorandum, including headings and footnotes, contains fewer than 6,250 based on the word count feature of Microsoft Word, and therefore complies with the Rule.

August 1, 2022                                         /s/ Pressly M. Millen