IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Case No. 1:22-CV-568

| | | |
|---|---|---|
| JULIETTE GRIMMETT, RALSTON LAPP GUINN MEDIA GROUP, and the JOSH STEIN FOR ATTORNEY GENERAL CAMPAIGN, JOSH STEIN, SETH DEARMIN, and ERIC STERN | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | **AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |
| v. | ) ) | |
| N. LORRIN FREEMAN, in her official capacity as District Attorney for the 10th Prosecutorial District of the State of North Carolina, | ) ) ) ) ) | |
| Defendant. | ) ) | |

Plaintiffs Juliette Grimmett, Ralston Lapp Guinn Media Group ("Ralston Lapp"), the Josh Stein for Attorney General Campaign ("Stein Campaign"), Josh Stein, Seth Dearmin, and Eric Stern, all six collectively referred to as "Plaintiffs"), by their undersigned counsel and pursuant to 28 U.S.C. §§ 2201 *et seq.*, and the First and Fourteenth Amendments to the United States Constitution, allege as follows:

## SUMMARY OF THIS ACTION

1.     This is an action for declaratory judgment and injunction by Plaintiffs who have been subjected for nearly two years to intrusive law-enforcement investigations, initiated by the losing candidate in the 2020 General Election for the Office of North Carolina Attorney General.  During the 2020 campaign, that losing candidate – Forsyth County District Attorney Jim O'Neill – made a number of accusations against North

Carolina Attorney General Josh Stein concerning the backlog of untested sexual assault evidence collection kits, or rape kits, including claiming that Attorney General Stein "has stood on the sidelines for almost his entire term while more than 15,000 untested rape kits have *sat on the shelves* of *the lab* that Stein is responsible for, collecting dust." The Stein Campaign believed O'Neill's statement, as well as others in the same vein, was false, both in its assertion that the kits were in the custody of the State Crime Lab (they were not), and that Stein had done nothing to reduce the backlog (it had in fact been a priority since Stein's first days in office, and measurable progress had been achieved in reducing the backlog).

2.     To defend against O'Neill's false accusations, the Stein Campaign ran a corrective advertisement – referred to internally as "*Survivor*" – that truthfully referenced O'Neill's record of indifference to the large backlog of untested rape kits in his own jurisdiction of Forsyth County. Before it was aired, *Survivor* was fact-checked by an outside research firm and confirmed by that firm to be truthful. It was also scrutinized later by two media organizations, neither of which concluded it was false. After *Survivor* aired, O'Neill claimed the ad was false and sought to retaliate. But he did not do so by pursuing a civil defamation action. Instead, as a sitting District Attorney, he sought to place law enforcement investigators in the position of judging the appropriateness of political speech. The resulting investigations, conducted pursuant to an archaic and never-before used law enacted in 1931, North Carolina General Statute § 163-274(a)(9) (the "Statute"), seek to punish Plaintiffs for core protected political speech and to chill

the speech of Plaintiffs and others going forward in clear violation of the First Amendment.

3. For that reason, this action seeks a Declaratory Judgment that the Statute is unconstitutional both on its face and as applied to the facts herein. This action also seeks injunctive relief in the form of a Temporary Restraining Order and Preliminary Injunction, and ultimately a Permanent Injunction, prohibiting the Defendant from taking further action against Plaintiffs and those associated with Plaintiffs pursuant to the unconstitutional Statute.

4. As described more fully below, the Statute – although it has been codified for nearly one hundred years – has never been the subject of a reported indictment or charge against any individual or entity, including any political campaign. Nor has it been the subject of any reported case from the North Carolina courts. In 2016, the United States Court of Appeals for the Sixth Circuit held that a nearly identical Ohio statute violated the First and Fourteenth Amendments because it was a content-based restriction that burdened core protected political speech in a manner not narrowly tailored to achieve a state interest. *See Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 469 (6th Cir. 2016).

5. Nevertheless, since 2020 Plaintiffs have been subjected to the burdens of multiple intrusive state investigations into a single line from a single Stein Campaign political advertisement, produced by Ralston Lapp and fact-checked by an independent research firm, in which Ms. Grimmett commented on Mr. O'Neill's failure to act with respect to over 1,500 untested rape kits languishing in the possession of the local law

enforcement authorities within Mr. O'Neill's prosecutorial jurisdiction. Both the North Carolina Constitution and General Statutes require Mr. O'Neill to advise these law enforcement authorities. The burden has now reached the point of imminent injury in the form of threatened enforcement proceedings, including criminal prosecution, if not enjoined by this Court.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this case under (i) 28 U.S.C. §§ 1341 & 1343, in that it seeks to secure equitable relief to redress the deprivation, under color of any state law or statute, of any right, privilege, or immunity secured by the Constitution or by any Act of Congress, specifically 42 U.S.C. 1983, (ii) under 28 U.S.C. § 2201(a) to secure declaratory relief, and (iii) under 28 U.S.C. § 2202 to secure preliminary and permanent injunctive relief.

7. Venue of this action is proper within this judicial district pursuant to 28 U.S.C. § 1391(b) because the facts giving rise to this action occurred therein – namely the location of the 1,500 untested rape kits in Mr. O'Neill's prosecutorial district at issue, where the political advertisement described below was broadcast, and where the complaint by Mr. O'Neill that triggered this matter originated.

## PARTIES

8. Juliette Grimmett is a resident of North Carolina. She is a survivor of sexual assault and a public advocate for the rights of sexual assault victims. She has over 24 years of professional experience creating and implementing violence prevention and response programs. In addition to her consulting work, she serves under contract as the

4

Sexual Assault Victim Policy Strategist for the North Carolina Department of Justice as part of a Sexual Assault Kit Initiative (SAKI) grant provided by the U.S. Department of Justice. As more fully alleged below, in 2020, Ms. Grimmett volunteered to appear in a political advertisement for the Stein Campaign and made the statement which is the subject of this declaratory judgment action.

9. Ralston Lapp is a media consulting firm that, among other things, advises political campaigns on media strategies and advertising. In 2020, on behalf of the Stein Campaign, Ralston Lapp produced the *Survivor* political advertisement in which Ms. Grimmett appeared and spoke. After producing that political advertisement, Ralston Lapp worked to place the advertisement with television stations throughout North Carolina, including in this District.

10. The Stein Campaign is the political campaign committee of North Carolina Attorney General Josh Stein, who was successfully elected as North Carolina's Attorney General in 2016 and again in 2020. The treasurer of the Stein Campaign is Scott R. Falmlen.

11. Plaintiff Josh Stein is a resident of Wake County, North Carolina, and the elected Attorney General of the State of North Carolina. The Stein Campaign was created to further his candidacy. Stein is asserting his claims in this action in his individual capacity and not in any official capacity.

12. Plaintiff Seth Dearmin is a resident of Wake County, North Carolina. He serves as the Chief of Staff of the North Carolina Department of Justice. During 2020, he also served part-time as a consultant to the Stein Campaign.

5

13.     Plaintiff Eric Stern is a resident of Pennsylvania.  During 2020, he served as the campaign manager for the Stein Campaign.

14.     Defendant N. Lorrin Freeman is sued in her official capacity as the District Attorney for the 10th Prosecutorial District of the State of North Carolina (Wake County).  In her official capacity, it is her responsibility to oversee the administration and application of the criminal laws of North Carolina within Wake County.  Ms. Freeman is a person within the meaning of  42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this Complaint.

## THE STATUTE

15.     Section 163-274(a)(9) of the North Carolina General Statutes purports to make it "unlawful":

> For any person to publish or cause to be circulated derogatory reports with reference to any candidate in any primary or election, knowing such report to be false or in reckless disregard of its truth or falsity, when such report is calculated or intended to affect the chances of such candidate for nomination or election.

The statute defines a violation of the statute as a Class 2 misdemeanor which can provide for both imprisonment up to 60 days and criminal fines for violators.

16.     The Statute was codified at least as early as 1931.  Despite the fact that it has been on the books for nearly one hundred years, there is no reported case or, upon knowledge and belief, other decision concerning application of the statute to any alleged candidate, campaign, or political advertisement.

6

## O'NEILL'S FALSE ACCUSATION AND THE CAMPAIGN'S RESPONSE

17.     The underlying dispute in this action concerns the handling of a backlog of untested rape kits in North Carolina.  After being elected Attorney General, in April 2017, Mr. Stein enlisted the help of the state's District Attorneys, including Mr. O'Neill, to determine the number of untested kits in their prosecutorial districts.  They were asked to send a letter to each law enforcement agency in their jurisdiction, tally the results, and then notify the State Crime Lab of that number.  Later that year, at the direction of the General Assembly, the Department of Justice commissioned a state-wide inventory concerning that backlog.  After the study concluded that there was a statewide backlog of some 15,000 untested rape kits, Attorney General Stein developed a strategy to attack the backlog.  He secured authorization from the General Assembly for and created a rape-kit tracking system and a working group in 2018 to develop a protocol for testing the as-yet untested kits, as well as all rape kits going forward.  Stein also secured $2 million in funding from the USDOJ Bureau of Justice Assistance on October 4, 2018, and then another $2 million from the Governor's Crime Commission on January 29, 2019.  Attorney General Stein secured these funds to accelerate the outsourcing of the old rape kits for testing.  Attorney General Stein and his team also drafted the Survivor Act which secured $6 million in state funding to further outsource testing and to institute requirements so that no backlog will develop in the future.  The General Assembly enacted the Survivor Act and the Governor signed it into law in September 2019.

18.     Despite the work done by Attorney General Stein on an issue that had been largely ignored by others, Forsyth County District Attorney Jim O'Neill, a political

7

opponent who became the eventual party nominee, made false reports about Attorney General Stein's record on the subject of rape-kit testing while misrepresenting his own record. On October 7, 2019, Mr. O'Neill issued a statement claiming that the Attorney General Stein "has stood on the sidelines for almost his entire term while more than 15,000 untested rape kits have *sat on the shelves* of the lab that Stein is responsible for, collecting dust." This statement was erroneous in two fundamental ways. After detailing Stein's many efforts to address the backlog and noting that the kits were actually in the possession of local law enforcement agencies, an independent fact check performed by MediaHub at UNC wrote, "Stein has 'not stood on the sidelines' of the issue, and there are not '15,000 untested rape kits' sitting on the shelves at 'the lab that Stein is responsible for.'" It concluded that O'Neill's claims about Stein's record on the rape kit backlog was "misleading at best and false at worst."

19.     At the same time he was making false claims about the efforts of Attorney General Stein, O'Neill also exaggerated his own work on this topic. On September 20, 2019, he issued a statement condemning Attorney General Stein stating that "I have been fighting & trying to give a voice to these victims for the last 23 y[ea]rs while you gave a 23 sec[ond] press conference." He also declared that eliminating the backlog was his "number one priority." The Stein Campaign believed that O'Neill's failure to address the large backlog within his own jurisdiction belied his claims to effective leadership on this issue.

20.     In order to answer the false accusations of its opponent and inform the electorate of what it believed to be relevant facts for the election, the Stein Campaign did

exactly what the First Amendment contemplates in addressing political disagreements: it publicly challenged those false accusations with speech of its own. The Campaign produced *Survivor*, a corrective political advertisement in the summer of 2020. Ralston Lapp was the producer of that advertisement.

21.    Ms. Grimmett personally appeared in the political advertisement and made the following statement, drawing a contrast between efforts made by Attorney General Stein to develop and execute on a strategy to address the untested rape kits and Mr. O'Neill's failure to engage in similar efforts within his own jurisdiction:

> As a survivor of sexual assault that means a lot to me and when I learned that Jim O'Neill left 1,500 rape kits on a shelf leaving rapists on the streets, I had to speak out.

22.    Mr. Stein, Mr. Dearmin, and Mr. Stern were all involved in the process of creating *Survivor*. Prior to producing *Survivor*, Ralston Lapp and the Stein Campaign had all the statements made in the political advertisement, including those of Ms. Grimmett, fact-checked by an outside research firm specializing in confirming the accuracy of claims made in political advertising. Specifically, the statement was based on the 2017 Sexual Assault Evidence Collection Kit Law Enforcement Inventory Report commissioned by the North Carolina Department of Justice which determined that local law enforcement agencies in Forsyth County – Mr. O'Neill's jurisdiction – possessed 1,509 untested rape kits as of 2017. At that time, candidate O'Neill had been the District Attorney of Forsyth County for over eight years and had been a prosecutor in the Forsyth County District Attorney's Office since 1997.

23.     As District Attorney of Forsyth County, Mr. O'Neill has an express constitutional duty under Article IV, Section 18(1) of the North Carolina Constitution and statutory obligation under N.C.G.S. 7A-61 to advise law enforcement agencies within his jurisdiction.   The message of the *Survivor* ad was that, as District Attorney, O'Neill claimed to prioritize "fighting & trying to give a voice to these [sexual assault] victims" yet had failed to effectively address the large backlog of untested rape kits on the shelves of the law enforcement agencies within his jurisdiction.   While Stein had worked extensively as Attorney General to reduce the backlog across the state, O'Neill had failed to pursue similar efforts within his own jurisdiction.   That contrast was a wholly appropriate subject for the electioneering communication contained in the political advertisement.  Such a communication is at the very heart of what the First Amendment protects.  In the United States, if a political candidate disagrees with an opponent, the remedy is to say so, and let the public decide, not seek to unleash criminal authorities to investigate political speech.

24.     *Survivor* was ultimately broadcast on various television stations throughout North Carolina during September and October 2020, including television stations within this District.  The placements for those broadcasts were made by Ralston Lapp and paid for by the Stein Campaign.  In addition, as required by North Carolina law, the political advertisement contained a statement that it was approved by Mr. Stein, the candidate himself.

## O'NEILL SEEKS A CRIMINAL INVESTIGATION INTO *SURVIVOR*

25.     On September 29, 2020, with the campaign fully underway, an attorney for the "Friends of Jim O'Neill" campaign committee filed a Complaint with the NCSBE alleging that the Stein Campaign and Attorney General Stein were in violation of the Statute on the grounds that candidate O'Neill, "who is the elected District Attorney for Forsyth County, has never in his career left 'rape kits sitting on a shelf'" because he was "never in the chain of custody as it relates to rape kits."

26.     The Complaint stated that "[t]o protect the integrity of future elections, the O'Neill Committee requests the Board of Elections investigate these allegations and find probable cause to refer this Complaint to the Wake County District Attorney for further action."

27.     Three days later, on October 2, 2020, Ms. Grimmett received a letter from a different attorney "writing on behalf of Jim O'Neill," claiming that her statement was "demonstrably false and legally actionable defamation."  The letter further claimed that although "O'Neill, in his role as Forsyth County District Attorney, is tasked with prosecuting all criminal actions in Forsyth County" and "often provides legal advice to enforcement agencies," the office "has never been the 'custodial agency' of 1,500 rape kits" and "there is no shelf at the Forsyth County District Attorney's office or anywhere else over which Mr. O'Neill has ever had control where 1500 rape kits were located."

28.     The letter to Ms. Grimmett concluded by stating, "[o]n behalf of Mr. O'Neill, we demand that you immediately cease and desist from continuing to disseminate this clearly false and defamatory advertisement, and that you take all action

11

to denounce these statements and prevent further publication."  The letter was an explicit attempt to silence Ms. Grimmett, a sexual assault survivor and advocate, and to dissuade her from her public advocacy mission including its core political speech.

29.     The issue of "chain of custody" is irrelevant to whether or not O'Neill should be held accountable by the electorate for his actions in addressing, or failing to address, the backlog of rape kits in his jurisdiction.  The advertisement never says the kits were in his custody, only that he "left them on the shelf" conveying that he was indifferent to and failed to address their presence in his prosecutorial district, notwithstanding his legal duty to advise local law enforcement.  His failure to provide leadership in his prosecutorial district on an issue he claimed was a priority was surely relevant to the electorate about whether he would competently address the issue statewide.  Furthermore, Mr. O'Neill himself introduced the concept of kits sitting on a shelf when he falsely accused the Attorney General of failing to act on the 15,000 kits that he claimed were "sitting on the shelves of the crime lab, collecting dust," Mr. O'Neill showed no concern about "chain of custody" nor the fact they were in possession of law enforcement agencies across the state including within his own jurisdiction, not at the State Crime Lab.  Notwithstanding these falsehoods, the Stein Campaign made no attempt to bring criminal sanction against O'Neill for his false statements made in the course of the campaign, but instead chose to rebut his false speech with corrective speech, as the First Amendment contemplates.

30.     Despite the contentions of Mr. O'Neill's counsel, two separate independent fact-checking organizations – one in broadcast media, the other in print – analyzed the

12

advertisement and neither concluded that it was false. Indeed, one of the fact checkers stated that another district attorney, "on condition of anonymity," stated that, while local law enforcement was typically responsible for having rape kits tested, that "doesn't leave the DA in that jurisdiction entirely blameless."

## THE INVESTIGATION BY THE STATE BOARD OF ELECTIONS

31.     The NCSBE took no action prior to the November 2020 General Election.

32.     In March 2021, however, some four months *after* the conclusion of the election, investigators for the NCSBE communicated to Ms. Grimmett that they were "seeking as much information as possible" concerning the political advertisement. The actions of the NCSBE were undertaken under color of state law and demonstrate disregard for the protections provided by the First Amendment by invoking the power and authority of a governmental agency to squelch free and critical debate about candidates for office.

33.     On March 15, 2021, Ms. Grimmett was interviewed by NCSBE investigators. Later that same month, Mr. Dearmin was interviewed by the same investigators.

34.     On July 14, 2021, counsel for the NCSBE reported to counsel for the Stein Campaign that they had "completed our investigation and presented our findings and recommendation" to the Wake County District Attorney's Office. Over a year later, in August 2022, Plaintiffs learned that the NCSBE's Report recommended that the investigation into *Survivor* be closed because the words of the advertisement were

13

ambiguous and any prosecution based on the political advertisement could be an unconstitutional application of the Statute.

### THE INVESTIGATION BY THE STATE BUREAU OF INVESTIGATION

35.     Unknown to Plaintiffs at the time, in the month prior to that communication from the NCSBE, the Wake County District Attorney's Office, contrary to the recommendation of the NCSBE, sought the assistance of the State Bureau of Investigation (SBI) to further investigate the matter.

36.     Over the course of the next six months, through the end of 2021, SBI agents conducted an exhaustive series of interviews into virtually every aspect of the political advertisement's creation, production, execution, and, most importantly, content. Those actions, again, were undertaken under color of state law and demonstrate disregard for the protections provided by the First Amendment by invoking the power and authority of a governmental agency to squelch free and critical debate about candidates for office.

37.     Ms. Grimmett, for her part, was subjected to a second interview on the ground that her first interview with the investigators for the NCSBE had not been recorded.

38.     On August 26, 2021, she sat for a grueling interview in which she was questioned at length concerning the content of the political advertisement, including the particulars of rape kit testing, classification of rape kits by type of assault, victim, and perpetrator, and the public policies surrounding determinations as to whether and when to test rape kits.

14

39.     After that interview, SBI investigators conducted no fewer than six additional interviews on the subject of the political advertisement, including a principal of Ralston Lapp, Mr. Stern, the Stein campaign treasurer, the Attorney General himself, as well as a second interview with Mr. Dearmin.

40.     From the beginning of 2022 through late May of this year, nothing further of substance was communicated regarding the investigation.

41.     Based on further communications concerning the investigation, however, Plaintiffs believe that enforcement action under the Statute is forthcoming.  In addition, Plaintiffs desire to continue to engage in the dissemination of information concerning political issues and candidates without the prospect of being dragged before governmental agents who seek to sit in judgment of the truth of political speech and who, in any event, can subject Plaintiffs and others to extensive and intrusive investigations under threat of criminal prosecution on subjects constituting core political speech.

42.     Plaintiffs, as (1) a victims-rights advocate, (2) a political and media consulting company, (3) a political campaign, (4) a candidate, (5) a campaign consultant, and (6) a campaign manager will be forced to restrain and temper their speech so that they avoid even the prospect that someone will claim that they violated the Statute and thereby subject themselves to lengthy and invasive investigations, potential criminal charges, and penalties.  In doing so, Plaintiffs and others are inevitably restrained from engaging in core political speech protected by the First Amendment.

15

## THE UNCONSTITUTIONALITY OF N.C. GEN. STAT. § 163-274(a)(9)

43.     The First Amendment to the United States Constitution guarantees to all Americans the right to speak freely and state their opinions on all matters and issues, including controversial topics.   Furthermore, the speech involved in this case – concerning a political candidate in the context of an election – is core political speech for which the First Amendment's protection is at its zenith.

44.     In *Susan B. Anthony List v. Driehaus*,[1] the United States Court of Appeals for the Sixth Circuit considered an Ohio law – Ohio R.C. § 3517.21(B)(10) – whose provisions were nearly identical to the North Carolina Statute (as well as a companion law concerning statements about voting records).   The Ohio statute made it a crime to "[p]ost, publish, circulate, distribute, or otherwise disseminate a false statement concerning a candidate, either knowing the same to be false or with reckless disregard of whether it was false or not, if the statement is designed to promote the election, nomination, or defeat of the candidate."[2]

45.     The Sixth Circuit struck down the Ohio laws as "content-based restrictions that burden core protected political speech and [which] are not narrowly tailored to achieve the state's interest."[3]   In so holding, the Sixth Circuit found that "Ohio's political false-statements laws target speech at the core of First Amendment protections – political speech."[4]   The Ohio law reached "not only defamatory and fraudulent remarks, but *all* false speech regarding a political candidate, even that which may not be material,

---

[1] 814 F.3d 466 (6th Cir. 2016).
[2] *Id*.
[3] *Id*. at 469.
[4] *Id*. at 473.

16

negative, defamatory, or libelous."[5]   As a result, "strict scrutiny" was the appropriate level of review for the challenge.[6]   That standard rendered the law "presumptively unconstitutional" such that it could only survive if it served "a compelling state interest" and was "narrowly tailored to achieve that interest."[7]

46.   The Sixth Circuit found that the law met the first test by "protecting voters from confusion and undue influence," and "ensuring that an individual's right to vote is not undermined by fraud in the election process."[8]   The law, however, failed the second test.

47.   The court found that the Ohio laws did not "pass constitutional muster because they are not narrowly tailored in their (1) timing, (2) lack of a screening process for frivolous complaints, (3) application to non-material statements, (4) application to commercial intermediaries, and (5) over-inclusiveness and under-inclusiveness."[9]

48.   With regard to timing, the court found that there was "no guarantee the administrative or criminal proceedings will conclude before the election or within time for the candidate's campaign to recover from any false information that was disseminated."[10]   The frivolous-complaint issue arose from the fact that complaints under the Ohio statute, as here, were not restricted "to state officials who are constrained by explicit guidelines or ethical obligations," but could be made, as happened here, by

---

[5] *Id*. (emphasis in original).
[6] *Id*.
[7] *Id*.
[8] *Id*. (internal quotation omitted).
[9] *Id*. at 474.
[10] *Id*.

"political opponents."[11]   The failure of the statute to facially exclude non-material falsehoods, rendered the statute "not narrowly tailored to preserve fair elections."[12]   The court also found fault that the statute applied "not only to the speaker of the false statement," but also potentially to "commercial intermediaries."[13]   Finally, the Sixth Circuit found the law "both over-inclusive and underinclusive," by virtue of the fact that it could damage an accused campaign while at the same time failing to timely penalize an offender.[14]

49.   In the 2014 case *281 Care Committee v. Arneson*,[15] the Eighth Circuit found a similar Minnesota law unconstitutional on nearly identical grounds, finding that "a credible threat of prosecution" led to an impermissible chilling of political speech.[16] The following year, the Supreme Judicial Court of Massachusetts struck down that State's cognate law using a strict-scrutiny analysis and rejecting the State's "attempt to shoehorn [the challenged law] into the exception for defamatory speech."[17]   In 2007, the Supreme Court of Washington struck down its law criminalizing certain political speech, finding that the "mere threat of such a process will chill political speech."[18]

---

[11] *Id.*
[12] *Id.* at 475.
[13] *Id.*
[14] *Id.*
[15] 766 F.3d 774 (8th Cir. 2014).
[16] *Id.* at 781.
[17] *Commonwealth v. Lucas*, 472 Mass. 387, 395 (2015).
[18] *Rickert v. State*, 161 Wash. 2d 843, 855 (2007).

## DEVELOPMENTS SINCE THE FILING OF THE COMPLAINT

50. The Complaint in this action was filed by Plaintiffs Grimmett, Ralston Lapp Guinn Group, and the Stein Campaign, along with a Motion for a Temporary Restraining Order and Preliminary Injunction, on July 21, 2022.

51. On July 25, 2002, proceedings were held on the Motion for Temporary Restraining Order. At those proceedings, counsel for Defendant Freeman indicated her intention to move forward with a grand jury in connection with the *Survivor* political advertisement that very afternoon if not enjoined.

52. Counsel for the NCSBE, for their part, stated that NCSBE's investigation relating to *Survivor* was complete and that it intended to take no further action relating to the investigation.

53. On July 25, 2022, the district court granted the Motion for Temporary Restraining Order and enjoined prosecution against any person for a violation of N.C. Gen. Stat. § 163-274(a)(9) relating to *Survivor*.

54. Thereafter, on July 29, 2022, Plaintiffs filed a Notice of Voluntary Dismissal with respect to the NCSBE Defendants.

55. On August 4, 2022, the district court conducted a hearing on the Motion for Preliminary Injunction. On that same day, the court extended the Temporary Restraining Order through August 9, 2022.

56. On August 9, 2022, the court entered an order denying Plaintiffs' Motion for Preliminary Injunction.

57.     The following day, August 10, 2022, Plaintiffs Grimmett, Ralston Lapp Guinn Group, and the Stein Campaign filed a Notice of Appeal with respect to the denial of the preliminary injunction, as well as an emergency motion for injunction pending appeal.  That emergency motion was denied on August 15, 2022.

58.     On August 17, 2022, those Plaintiffs filed a Motion for Injunction Pending Appeal with the Court of Appeals for the Fourth Circuit.  The Court of Appeals issued an Order requiring Defendant to respond to that motion by Thursday, August 18, 2022.

59.     On Monday, August 22, 2022, while the Motion for Injunction Pending Appeal was pending before the Court of Appeals, Defendant sought and obtained a "presentment" from a Wake County grand jury against Plaintiffs Stein, Dearmin, and Stern.   Under North Carolina law, a presentment is a preparatory step that allows a prosecutor to submit an indictment for a misdemeanor.  A presentment, however, "does not institute criminal proceedings against any person, but the district attorney is obligated to investigate the factual background of every presentment returned in his district and to submit bills of indictment to the grand jury dealing with the subject matter of any presentments when it is appropriate to do so." N.C. Gen. Stat. 15A-641(c).

60.     The day after Defendant obtained the presentment, the Court of Appeals granted the injunction pending appeal.

**FIRST CAUSE OF ACTION**
**DECLARATORY JUDGMENT**

61.     Paragraphs 1 through 60 of the Complaint are realleged as if fully set forth herein and reincorporated by reference.

62.     Plaintiffs are entitled to a declaration that the Statute is unconstitutional both on its face and as applied to them.  Plaintiffs are currently under the cloud of the burdensome and protracted investigation with the possibility of further action based on the presentment as described above.  Plaintiffs also intend to continue to engage in the core political speech described above in a manner that potentially subjects them to further investigation backed by the additional threat of criminal prosecution under the Statute.

63.     The North Carolina Statute is no different in its effect from the similar statutes ruled unconstitutional in Ohio, Minnesota, and the other States.  Like those statutes, it is a content-based law seeking to regulate, as well as criminally punish, core political speech.  As such, it is both subject to strict scrutiny and presumptively unconstitutional.

64.     The fact that the Statute provides for no vetting process makes it likely, as happened here, that complaints will be lodged by political opponents.  Section 15A-304 of the North Carolina General Statutes permits citizens (not just law enforcement authorities or even aggrieved political candidates) to initiate the issuance of arrest warrants for misdemeanor charges, including against persons who are claimed to have engaged in political speech in violation of the Statute.

65.     The overbreadth of the statute is shown by the fact that it could be applied not only to the speaker(s) (here Ms. Grimmett whose comments were featured in the advertisement or Mr. Stein as the "approving candidate"), but also, conceivably, to the campaign and campaign personnel, the author(s) of the statement, the company

producing the advertisement (*e.g.*, Ralston Lapp), and even the television stations or other media outlets airing the advertisement.

66.     As shown by the circumstances present here, the timing of complaints and the protracted handling of investigations virtually assures that no timely redress will be had either by the accused campaign or the one targeted by the putatively false statement. Indeed, it is now 21 months since the election in connection with which the political advertisement ran.   No one can be timely penalized and the only effect, apart from punishment, will be to chill speech in "future elections."   In fact, it was only such future relief that the O'Neill Campaign sought from the Board of Elections in its initial complaint.  Such relief, however, necessarily serves only to chill free speech.  Indeed, the present investigation is already serving to chill campaign speech in the 2022 election as candidates are reluctant to criticize Defendant herself, as well as other candidates for office, for fear of prosecution under this long-dormant statute.

67.     In short, the Statute accomplishes no compelling interest of the State, let alone does so in a narrowly tailored fashion.  The fact that the specter of the Statute has forced these Plaintiffs to engage with an invasive and expensive investigation for nearly two years shows that the Statute serves primarily to chill protected political speech.

68.     Plaintiffs have no adequate remedy at law.  The Statute should be declared unconstitutional and any enforcement proceeding under the Statute should be temporarily, preliminarily and permanently enjoined.

## SECOND CAUSE OF ACTION
## FIRST AMENDMENT & 42 U.S.C. § 1983

69.     Paragraphs 1 through 68 of the Complaint are realleged as if fully set forth herein and reincorporated by reference.

70.     The Statute as alleged above violates the freedom of speech clause of the First Amendment of the United Stated Constitution by purporting to regulate, through the criminal laws of North Carolina, speech at the absolute core of the First Amendment – protected political speech – all in violation of 42 U.S.C. § 1983.

WHEREFORE, Plaintiffs pray the Court that:

A.      The Court declare pursuant to 28 U.S.C. § 2201(a) that N.C. Gen. Stat. § 163-274(a)(9) unconstitutional;

B.      The Court grant temporary and/or preliminary injunctive relief as well as a permanent injunction in favor of Plaintiffs barring enforcement of N.C. Gen. Stat. § 163-274(a)(9); and

C.      The Court grant Plaintiffs such further relief as it may deem appropriate.

This the 29th day of August, 2022.

By:     /s/ Pressly M. Millen
        Pressly M. Millen
        State Bar No. 16178
        Raymond M. Bennett
        State Bar No. 36341

OF COUNSEL:

WOMBLE BOND DICKINSON (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, North Carolina 27601

(919) 755-2100

Attorneys for Plaintiffs Juliette Grimmett,
Ralston Lapp Guinn Media Group,
the Josh Stein for Attorney General Campaign,
Josh Stein, Seth Dearmin, and Eric Stern